## Commonwealth *v.* Feinberg, Appellant.

Argued June 19, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Seymour Kurland,* with him *Bernard Chanin, Melvin Dildine,* Assistant Defenders, and *Herman I. Pollock,* Defender, for appellant.

*Gordon Gelfond,* Assistant District Attorney, with him *Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MONTGOMERY, J., November 16, 1967:

These appeals are from judgments of sentence imposed following appellant's conviction on five charges of involuntary manslaughter.[1] They arose by reason of the deaths of five individuals[2] from methyl alcohol (methanol) poisoning due to their consumption of Sterno, a jelly-like substance prepared and intended

---

[1] Appellant was also convicted on twelve other charges of involuntary manslaughter and on seventeen charges of violating the Pharmacy Act, Act of September 27, 1961, P. L. 1700, §1, 63 P.S. §390-1 et seq. (pp), but these cases are not before us.

[2] Bill 1934—Lynwood Scott; Bill 1940—John Streich; Bill 1942—James Newsome; Bill 1946—Edward Harrell; Bill 1949—Juanita Williams.

for heating purposes. It is solidified alcohol popularly called "canned heat" but has additives specified by the United States government to render it unfit for drinking purposes.

Appellant Max Feinberg was the owner of a cigar store handling tobacco, candy, etc., in the skid-row section of Philadelphia and sold to residents of that area Sterno in two types of containers, one for home use and one for institutional use. Such sales were made under circumstances from which it could be reasonably concluded that appellant knew the purchasers were intending to use it for drinking purposes by diluting it with water or other beverages, and not for its intended use.[3] Prior to December, 1963 there had been no known fatal consequences resulting from this practice, presumably for the reason that the product then sold by appellant contained only four per cent methyl alcohol (methanol). However, on December 21, 1963 appellant bought from the Richter Paper Company ten additional cases of institutional Sterno containing seventy-two cans each, unaware that it contained fifty-four per cent methanol, although the lid of each container was marked "Institutional Sterno. Danger. Poison; Not for home use. For commercial and industrial use only", and had a skull and crossbones imprinted thereon. Nevertheless appellant ignored this warning and sold part of this supply in the same manner he had previously dispensed his other supply of the product. The containers of the regular Sterno and the institutional type previously sold contained no such warning and were merely marked "Caution. Flammable. For use only as a fuel." The only difference in the containers previously sold was

---

[3] In selling Sterno appellant recognized an order to "make one" as a request for a can of Sterno; he generally referred to Sterno as shoe polish and frequently requested purchasers to conceal their purchases under their coats.

that the institutional type was so marked but had no wrap-around label as was affixed to the container intended for regular use.  Both containers were the same size, as were the containers sold after December 21st which did not contain wrap-around labels.  Between December 23 and December 30, 1963 thirty-one persons died in this area as a result of methyl alcohol poisoning.  After hearing of their deaths, appellant, on December 28, 1963 returned to the Richter Paper Company four cases and forty-two cans which remained unsold from the ten cases he had purchased on December 21, 1963, at which time he remarked about the change in markings on the cans.  Appellant was the only purchaser in the Philadelphia area of this new institutional product from the Richter Company.  The methanol content of institutional Sterno had been increased by the manufacturer from four per cent to fifty-four per cent in September, 1963 but the new product was not marketed until December, 1963.  Richter received the first shipment of it on December 11, and another on December 17, 1963.  The chemical contents of the new institutional product were not stated on the container; nor was the appellant informed otherwise of any change in the contents of that product except by the notice of its dangerous contents for home use, as previously recited.

It is the contention of the appellant that his convictions on the charges of involuntary manslaughter cannot be sustained either on the basis of a violation of the Pharmacy Act of September 27, 1961, P. L. 1700, §1, 63 P.S. §390-1 et seq. (pp), or as a result of any criminal negligence on his part.  His first contention is based on the arguments that the Pharmacy Act is not applicable to sales of the product described in this case; that if it is covered, no violations of the act by appellant were proved, nor was it proved that he had knowledge of any violations.

The 1961 Pharmacy Act is a re-enactment of prior statutes with amendments, revisions, consolidations and repeals. It is titled, "AN ACT Relating to the regulation of the practice of pharmacy, including the sales, use and distribution of drugs and devices at retail; . . ." The earlier Act of 1887, P. L. 189, was "To regulate the practice of pharmacy and sale of poisons, and to prevent adulterations in drugs and medicinal preparations, . . ." The Act of 1917, P. L. 208, was "To regulate the practice of pharmacy and sale of poisons and drugs, and providing penalties for the violation thereof; . . ." Although the Acts of 1917 and 1887 describe a pharmacy as a retail drug store, or any place where drugs, medicines, or *poisons* are compounded, dispensed, prepared or sold at retail, whereas the 1961 Act describes the "Practice of pharmacy" as "the practice of that profession concerned with the art and science of preparing, compounding and dispensing of drugs and devices . . .", without the special mention of poisons, we note that each of these acts provides for special precautions to be taken in dispensing poisons. The word "devices" as found in the 1961 Act is new although it is used in The Drug, Device and Cosmetic Act of September 26, 1961, P. L. 1664, 35 P.S. §780-1 et seq.

In the two earlier acts "poison" is defined in a general manner as "any drug, chemical or preparation, which, according to standard works on medicine or materia medica, is liable to be destructive to adult human life, in quantities of sixty grains or less." In the 1961 Act poisons are specifically named and described. Methyl alcohol and preparations containing one per centum or more of it, except when used as a preservative and not sold to the general public, is one of the enumerated poisons.

Appellant concedes that the new institutional product under consideration falls within the definition of

poison set forth in the 1961 Act. However, he argues that the act was not intended to cover a product such as Sterno, which is manufactured to produce heat and is not a drug, medicine, device, etc., intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animal or to affect the structure or any function of the body of man or other animal. In support of his argument appellant cites the case of *Boyd v. Frenchee Chemical Corporation*, 37 F. Supp. 306 (E.D.N.Y. 1941), which held that the Act of 1917, previously mentioned, was not intended to cover a liquid shoe and fabric cleaner which might come within the general definition of a poison. The reason for that decision was that such a product was not such as was intended for the cure or prevention of illness in man or animal. He also cites an opinion of the Attorney General of Pennsylvania on phosphorous matches reported in 21 Pa. Dist. Rep. 554, which advised that phosphorous watches were not covered by the act for the same reason, although they were poisonous. The *Boyd* decision was subsequently referred to in *Spruill v. Boyle-Midway, Inc.*, 308 F. 2d 79 (1962), which involved a furniture polish. It was criticized therein for the limited view taken by that Court on the subject of intended use of a manufactured product, but it did not comment on the correctness of the decision on the question whether liquid shoe and fabric cleaner was intended to be included in the Pennsylvania Act of 1917, P. L. 208, No. 119.

Our close study of the 1961 Pharmacy Act leads us to the conclusion that it was not intended to cover general commercial products but was limited to drugs and devices as defined in the act and that the provisions respecting poison are to be followed only when poisonous drugs or poisonous devices are sold in connection with the practice of pharmacy or incident thereto. The title to the bill as previously recited

refers only to drugs and devices. Although poisons were included in the title to the earlier acts no mention is made of poisons in the title to the 1961 Act. The term "drugs" is defined therein in Section 2 though, 63 P.S. §390-2:

"(3) 'Drugs' mean—

(i) Articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary.

(ii) Articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals.

(iii) Articles (other than food) intended to affect the structure or any function of the body of man or other animals", and

"(5) The term 'device' means instruments, apparatus and contrivances, including their components, parts and accessories, intended (i) for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals, or (ii) to affect the structure or any function of the body of man or other animals."

Sterno does not fall within the foregoing definitions of drugs or devices. It is a product intended by its manufacturers for heat producing purposes only and not for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animal, nor to affect the structure or function of the body of either. There is nothing in this record to indicate otherwise. It was not prepared for use as a medicine or a beverage for which misuse the purchasers of same converted it by dilution.

Our conclusion as to the intention of the Legislature in enacting the 1961 Pharmacy Act also finds support in two other acts of the Legislature. The Act of June 24, 1939, P. L. 872, §659, 18 P.S. §4659, dis-

tinguished between drugs, medicines, *and poisons* in making it a misdemeanor to dispense such articles by means of vending machines; and the Act of February 2, 1966, P. L. (1965) 1867, §1, 18 P.S. §4637.1 (pp.),[4] specifically made it a crime to manufacture, sell, etc., the very object we are discussing, a heating fuel made of any mixture or preparation of solidified alcohol containing more than four per cent methyl or wood alcohol. Statutes in pari materia should be considered concurrently whenever possible and if they can be made to stand together effect should be given to both as far as possible. *Sterling Acceptance Co. v. Grimes,* 194 Pa. Superior Ct. 503, 168 A. 2d 600 (1961). Had the Legislature intended a product such as Sterno to be covered by the Pharmacy Act this amendment to the Criminal Code would not have been necessary. The penalty in the Pharmacy Act could have been made more severe. Furthermore, there are many other products on the market containing methyl alcohol which are sold generally, i.e., antifreeze, dilutions for shellac and certain varnishes, etc., and which would fall under the Pharmacy Act if the contention of the appellee were sustained. We do not believe the Legislature intended to limit the sale of such products or Sterno to pharmacies.

Our conclusion, therefore, is in accord with that of the Attorney General in Phosphorous Matches, supra, which is entitled to great weight, *Davis v. Sulcowe,* 416 Pa. 138, 205 A. 2d 89 (1964), affirming 81 Dauph. 72, and with *Boyd v. Frenchee Chemical Corporation,* supra.

There remains the question of whether the Commonwealth has established that the deaths under consideration were due to the criminal negligence of the

---

[4] This act cannot be considered as supporting these convictions since it was enacted subsequent to the crimes covered by them.

appellant. Involuntary manslaughter consists of the killing of another person without malice and unintentionally, but in doing some unlawful act not amounting to a felony, or in doing some lawful act in an unlawful way. Where the act in itself is not unlawful, to make it criminal the negligence must be of such a departure from prudent conduct as to evidence a disregard of human life or an indifference to consequences. *Commonwealth v. Hartle*, 200 Pa. Superior Ct. 318, 188 A. 2d 798 (1963), and restated in *Commonwealth v. Farrell*, 208 Pa. Superior Ct. 200, 222 A. 2d 437 (1966).

We are satisfied that the record clearly establishes that appellant, in the operation of his small store with part-time help, knew that he was selling Sterno in substantial quantities to a clientele that was misusing it; that in order to profit more from such sales he induced Richter Paper Company to procure for him a supply of the institutional product because the cost of same was less than the regular type with labels; that he was aware of the "poison" notice and warning of harmful effects of the new shipment received on December 21, 1963 but nevertheless placed it in stock for general sale by himself and his employes; and thereafter sold several hundred cans of it; and that he dispensed it without warning his purchasers of the harmful effect it would have if misused for drinking purposes, and without directing their attention to the warning on the containers.

If the deaths of these five persons were the result of appellant's actions, it justifies his conviction for involuntary manslaughter.[5] Although a more culpable degree of negligence is required to establish a criminal homicide than is required in a civil action for damages, we find the appellant's actions as fully meeting the def-

---

[5] See *Thiede v. State*, 106 Neb. 48, 182 N.W. 570 (1921), for a similar ruling involving liquor of extreme potency and poisonous ingredients; and 26 Am. Jur., Homicide, §203.

inition and requirement of proof set forth in *Commonwealth v. Aurick*, 342 Pa. 282, 19 A. 2d 920 (1941). In the light of the recognized weaknesses of the purchasers of the product, and appellant's greater concern for profit than with the results of his actions, he was grossly negligent and demonstrated a wanton and reckless disregard for the welfare of those whom he might reasonably have expected to use the product for drinking purposes.

Next, we must proceed to a determination of whether the evidence is sufficient to establish that appellant's conduct was the proximate cause of the deaths with which he is charged.

### Bill 1934—Lynwood Scott

Lynwood Scott, white, age 50, was pronounced dead on December 26, 1963 at 3:00 p.m. His death was attributed to methyl alcohol poisoning by a medical expert. Found near his body were the following extraneous evidence: an institutional brand type empty Sterno can; an institutional type of Sterno can which contained a small amount of pink liquid; a Sterno can, the commercial brand labeled kind, containing a pink liquid; a jar containing four ounces of pure white liquid; a four ounce jar containing a half ounce of green fluid.

The first item was empty and therefore its contents were not subject to analysis. The contents of the second item, being another can of institutional Sterno, were analyzed and found to be the residuum of the type of Sterno containing a high percentage of methyl alcohol. The third item was the commercial labeled type of Sterno and apparently was not analyzed for that reason. The fourth and fifth items showed nothing significant concerning methyl alcohol. Thus the only source of the lethal poison was the second can of

institutional Sterno. However, the only evidence to connect the appellant with Lynwood Scott is that of Arthur Harold, appellant's part-time employe, who said Scott made purchases of Sterno at appellant's store, but he was unable to tell when or how frequently he did so.

### Bill 1940—John Streich

John Streich, age 51, was pronounced dead on December 30, 1963 of methyl alcohol poisoning delayed "for several hours to one to two days". Five empty institutional type Sterno cans without lids, and one regular type can containing less than an ounce of pink fluid were found near him. However, it was testified that the contents of the regular type can alone could not have been the cause of death, and that death was consistent with the drinking of the higher alcoholic content type institutional Sterno.

John Woods testified that around the holiday season when everyone got sick, he and Jimmy Houston bought Sterno at appellant's store, mixed it with pepsi cola and drank it in company with Jimmy Newsome and Jack Stretch (Streich), Newsome and Streich dying the following morning.

### Bill 1942—James Newsome

James Newsome, age 44, was pronounced dead on December 30, 1963 due to delayed methyl poisoning from drinking Sterno of the type having a high methyl alcohol content. Found near him were a quart bottle labeled King Sherry, several empty cans of all types of Sterno, the regular variety, the institutional type without skull and crossbones and the institutional type with skull and crossbones. One can of institutional Sterno without skull and crossbones was found with

about an ounce of pink jelly in it. Upon analysis, this was found to contain one per cent wood alcohol. The King Sherry bottle had in it a small amount of liquid which contained about one-half per cent of wood alcohol and twenty per cent grain alcohol.

## Bill 1946—Edward Harrell

Edward Harrell, age 48, was pronounced dead of methyl alcohol poisoning on December 24, 1963 at 2:00 p.m. Nothing was found to indicate its source. The expert, however, testified thirty-five per cent of methyl alcohol found in his blood specimen was not consistent with the regular type of Sterno found on the market today.

Arthur Harold identified Harrell as a purchaser of Sterno but could not say when he had made purchases.

## Bill 1949—Juanita Williams

Juanita Williams was pronounced dead on December 25, 1963 at 2:30 p.m. of methyl alcohol poisoning. A partially empty can of Sterno of the industrial type was found near her, but on analysis of the contents was found not to be consistent with her death, since it did not contain a sufficient percentage of methyl alcohol. However, Wayne Williams, who described himself as the common-law husband of the decedent, testified that on December 24, 1963 he bought three unlabeled cans of Sterno from appellant's store and took it home where his wife mixed it with water to make "a little over a half a gallon" from the three cans, the empty cans being discarded out the back window; that they drank some of the mixture during Christmas Eve; that the next morning his wife was ill and he called a doctor but she was dead before he

arrived; that he also became ill, getting blind staggers which compelled his removal to the hospital.

From the foregoing evidence Hon. CHARLES L. GUERIN, Judge, who tried these cases without a jury, found that the deaths of the five persons previously named were due to methyl alcohol poisoning due to drinking institutional Sterno, containing a large quantity of methanol, procured from the appellant. There is sufficient direct evidence to support this finding as to Juanita Williams.

As to the others, the evidence is largely circumstantial. Although earlier decisions enunciated the rule that to warrant a conviction on circumstantial evidence alone such evidence must exclude to a moral certainty every hypothesis but that of guilt, or must be inconsistent and irreconcilable with any reasonable hypothesis of the accused's innocence, the more recent decisions state the rule to be that to warrant a conviction on circumstantial evidence the facts and circumstances established by such evidence must be of such a character as to produce a moral certainty beyond a reasonable doubt, but need not be absolutely incompatible with innocence. However, guilt must be proved and not be conjectural, and cannot rest solely on suspicion or surmise. *Commonwealth v. LaRue,* 381 Pa. 113, 112 A. 2d 362 (1955).

Following this guide in analyzing the evidence we readily conclude that it is insufficient to prove the guilt of the appellant for the death of Edward Harrell. True, he died of methyl alcohol poisoning during the period appellant was selling the lethal type of Sterno, but there is no proof that he was sold such product or received it from anyone who had procured it from appellant. He was identified merely as a customer in appellant's store who bought Sterno, which purchases may have been long before appellant began selling the dangerous types. Furthermore, no extra-

neous evidence such as cans of the product were found near him when his body was found.

The evidence in the case of Lynwood Scott is stronger. He died of methyl alcohol poisoning during the period appellant was selling the lethal variety, a can of such variety was found near his body, appellant was the only source of such variety, and Scott was identified as a customer of Sterno in appellant's store. Although the time he made purchases was not established by direct evidence, it may reasonably be concluded that it was during the period the lethal variety was being sold by appellant since a container of such variety was found near him.

The deaths of John Streich and James Newsome may be considered together since they died the same day, December 30, 1963 from methyl alcohol poisoning after having drunk Sterno mixed with pepsi cola in the company of one another and of James Woods. Woods' testimony to having purchased Sterno during the holiday season of 1963 from appellant, the finding of empty institutional Sterno containers without lids (the distinguishing marks of the lethal type being on. the lids of the containers they could not be identified as such), and the testimony of the medical expert that their deaths were consistent with drinking the higher alcoholic content type of Sterno was sufficient to satisfy the aforesaid rule. Appellant argues, however, that since Woods testified to having bought the product from appellant on December 29, the day before the deaths, and which was the day after appellant returned the unsold part of the order of lethal Sterno to Richter Company, that this established that his actions were not the cause of their deaths. We do not agree. The record does not establish as a certainty that all of the unsold cans were returned and it was for Judge GUERIN to determine this fact. In the light of the testimony of appellant's employe Harold that

on the twenty-seventh of December he was told by appellant to tell the police, if they came to investigate, that they had no Sterno on the premises, when on that day they did have, was a factor for the fact finder to consider in determining whether sales were made of the dangerous product after December 28, 1963.

We find no merit in appellant's argument that there is no evidence to prove he ever sold a can of the new institutional Sterno. The evidence clearly shows that he was in full charge of the operation of the store when the bulk of the new product was sold. Harold was only a part-time employe coming in after school and on Saturdays, and during this period appellant's wife and family were in Florida, which left appellant as the one who made the bulk of the sales.

Nor do we find any merit in his argument that he was unaware of the warning on the cans. He must have handled many of them during the course of events when almost four hundred cans were sold. The circumstances established by the evidence sufficiently supports a finding that he did know of the change in markings but disregarded it. As far as instructing anyone else to sell the product, the fact that it was available for sale in an opened carton under the counter is sufficient to indicate an implied authorization.

The facts in this case do not indicate the prosecution of a person for acts done by another without his knowledge or consent. Appellant was the active participant with full knowledge. He, personally, and through his part-time employe, acting under his orders, committed the crimes. For this reason alone it is readily distinguishable from *Commonwealth v. Koczwara*, 397 Pa. 575, 155 A. 2d 825 (1959).

The judgments of sentence, therefore, are affirmed in the cases of Lynwood Scott, Appeal No. 166 on Bill 1934; John Streich, Appeal No. 167 on Bill 1940; James Newsome, Appeal No. 168 on Bill 1942; and

Juanita Williams, Appeal No. 170 on Bill 1949; and the judgment is reversed and appellant discharged in the case of Edward Harrell, Appeal No. 169 on Bill 1946.

DISSENTING OPINION BY HOFFMAN, J.:

The lower court found defendant guilty on five counts of involuntary manslaughter. Our court today holds that the sale of Sterno does not fall within the Pharmacy Act and, consequently, does not allow a conviction based on a violation of this Act. With this result I readily concur.

The majority, however, seeks to affirm the judgment of sentence by holding that the lower court found that defendant was guilty of criminal negligence. A careful review of the record discloses that the basis of the judge's decision is never clearly set forth. Indeed, the remarks on the record and opinion of the lower court tend to indicate that the judge considered only the violations of the Pharmacy Act and not criminal negligence in general.

In overruling defendant's demurrer, the lower court stated: "It is my considered opinion that the evidence produced by the Commonwealth with respect to each of the indictments as to which the demurrer has been offered [all outstanding bills at that time] has established a strong prima facie case of violation of the Act of Assembly [Pharmacy Act] in question."

A short time later, the trial judge set forth his reasons for finding defendant guilty. He defined involuntary manslaughter as the: ". . . unlawful killing of another without malice. Involuntary manslaughter results where there is no specific intention to take life, but from the doing of a lawful act in an unlawful manner or from the doing of an unlawful act." The trial court then devoted five pages to discussing defendant's actions with regard to the Pharmacy Act under the

above definition. In his concluding remarks at the trial, the judge stated: "There are many other reasons that support my ultimate conclusions which I feel are not absolutely essential and necessary for me now to state, but for these reasons, as well as other reasons which will later appear if the necessity therefor should arise, I now adjudge the defendant guilty upon all indictments charging involuntary manslaughter, . . . ." These further reasons are not found anywhere in the record.

Lastly, the trial court filed an "Adjudication Opinion." Such an opinion must be filed pursuant to Rule 46 of the Rules of the Superior Court which provides in part that, upon notice of appeal, ". . . the court below shall forthwith file of record at least a brief statement of the reasons for such order, judgment or decree, in the form of an opinion. . . ." In its opinion, the lower court once again defined involuntary manslaughter as previously stated. It then devoted six pages to a discussion of the applicability of the Pharmacy Act to this defendant and concluded that, ". . . it is our opinion that defendant committed an unlawful act in violation of the Pharmacy Act in selling institutional Sterno, . . . ." The court, on the last page of its opinion, cited *Spruill v. Boyle-Midway, Inc.,* 308 F. 2d 79 (1962), a civil case, to show that defendant could have reasonably foreseen the consequences of his actions,[1] and then concluded that: "In our opinion, defendant recklessly and negligently sold Sterno—not for its intended use—but for the purpose that resulted in these untimely deaths."

At no point in the record, however, is there a suggestion that the lower court found defendant guilty of

---

[1] Note should be taken of the fact that the judge, in discussing the Pharmacy Act itself, imported a civil standard which would be inappropriate in any event. Foreseeability is an irrelevant consideration with regard to violations of the Pharmacy Act.

criminal negligence. There is no definition or discussion of this theory with reference to defendant's acts. Nor does the opinion of the court, required by Rule 46, set forth criminal negligence as one of the reasons for finding defendant guilty. The reference to defendant's reckless and negligent sale of Sterno appears only in the context of a discussion of the issue of foreseeability. Any inference that the lower court was also referring to criminal negligence is at best equivocal since there is only a peripheral mention of negligence appended to a comprehensive analysis of the Pharmacy Act.

In light of this record, it is our duty on appellate review to assure that the defendant has received all of the procedural and substantive safeguards in nonjury as well as jury trials, and that the prosecution has proved its case beyond a reasonable doubt.

The defendant in this case waived his right to trial by jury. In a trial before a judge, as distinguished from a trial before a jury, no formal instructions are given. Thus, our Court can only determine from the judge's remarks on the record and from the required opinion whether the law has been applied correctly. In other words, the sole question before us is whether the judge, sitting as a fact finder, found defendant guilty of criminal negligence rather than ascertaining whether the record discloses facts upon which defendant *could* be found guilty. We must, therefore, be convinced beyond a reasonable doubt of defendant's guilt based on the proper standard. See *United States v. Maybury*, 274 F. 2d 899 (2d Cir., 1960).

Had this case been tried before a jury which received instructions that failed to set out the legal standards of criminal negligence upon which the defendant could be found guilty, we would not assume that the jury actually found defendant guilty on that basis. The conviction, therefore, would, of necessity, be reversed.

.

Today, the majority affirms defendant's conviction on the ground of criminal negligence when virtually all references in the record are to the Pharmacy Act. The opinion, as previously noted, addressed itself only to the issue of negligence parenthetically and ambiguously. Since one obvious purpose of Rule 46, which mandates an opinion, is to permit our Court appropriately to review the judge's application of law to his findings of fact in a nonjury trial, we cannot hazard a guess that the lower court, *sub silentio*, based its decision on the grounds of criminal negligence. Moreover, the implication of the statement by the lower court that it could state "other reasons" to find defendant guilty, if necessary, is that it only found defendant guilty under the Pharmacy Act. Thus, we cannot impose our own judgment, in my view, if the lower court has remained silent as to the law applied to its findings of fact or where the reference to the appropriate standard is only mentioned tangentially.

Therefore, since it is impossible to determine from this record whether the lower court found defendant guilty of criminal negligence, the present verdict should not be sustained. I would reverse and grant a new trial.