Commonwealth *v.* Feinberg, Appellant.

Argued January 15, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Bernard L. Segal,* with him *Needleman, Needleman, Segal and Tabb,* for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Jay S. Gottlieb,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, April 23, 1969:

Appellant Max Feinberg owned and operated a cigar store in the skid-row section of Philadelphia. One of the products he sold was Sterno, a jelly-like substance composed primarily of methanol and ethanol and designed for cooking and heating purposes. Sterno was manufactured and sold in two types of containers, one for home use and one for industrial use. Before September, 1963, both types of Sterno contained approximately 3.75% methanol, or wood alcohol, and 71% ethanol, or grain alcohol; of the two types of alcohols,

methanol is far more toxic if consumed internally. Beginning in September of 1963, the Sterno company began manufacturing a new type of industrial Sterno which was 54% methanol. The cans containing the new industrial Sterno were identical to the cans containing the old industrial Sterno except in one crucial aspect: on the lids of the new 54% methanol Sterno were imprinted the words "Institutional Sterno. Danger. Poison. For use only as a Fuel. Not for consumer use. For industrial and commercial use. Not for home use." A skull and crossbones were also lithographed on the lid. The carton in which the new Sterno cans were packaged and shipped did not indicate that the contents differed in any respect from the old industrial Sterno.

According to its records, Sterno Corporation sent only one shipment of the new Sterno to the Philadelphia area; that shipment went to the Richter Paper Company and was received on December 17, 1963. Charles Richter, president of the firm, testified that his company, in turn, made only one sale of the new industrial Sterno, and that was to appellant. Richter testified that his records indicated that appellant received the Sterno on December 21 and, since Richter had not opened any of the cartons, he was unaware that he was selling appellant a new type of industrial Sterno. On December 27, Richter received a call from appellant informing him that the cartons contained a new type of Sterno and that appellant wished to return the portion of his order that he had not sold. The unused cartons were picked up by Richter's deliveryman the next day.

Meanwhile, between December 21 and December 28, appellant had sold approximately 400 cans of the new industrial Sterno. Between December 23 and December 30, thirty-one persons died in the skid-row area

as a result of methanol poisoning. In many of the cases the source of the methanol was traced to the new industrial Sterno. Since appellant was the only retail outlet of this type of Sterno in Philadelphia, he was arrested and indicted on thirty-one counts charging involuntary manslaughter and on companion bills charging violations of the Pharmacy Act (Act of September 27, 1961, P. L. 1700, §1 et seq., 63 P.S. §390-1 et seq.).[1]

Appellant was convicted on seventeen counts of involuntary manslaughter and on twenty-five counts of violating the Pharmacy Act by Judge CHARLES L. GUERIN, sitting without a jury. Judge GUERIN held that appellant had violated the Pharmacy Act and that, therefore, he was guilty of a misdemeanor-manslaughter in each of the seventeen cases. Five of the manslaughter convictions were appealed to the Superior Court which affirmed four of them, although on a different theory. *Commonwealth v. Feinberg*, 211 Pa. Su-

---

[1] Section 9 of the Act, dealing with poisons, states in pertinent part: "(a) Poison means and includes the compositions of the following schedules: . . . Schedule 'B' . . . (12) Methyl alcohol or formaldehyde, and preparations containing one per centum or more of these compounds, except when used as a preservative and not sold to the general public. . . . (d) No person shall sell, distribute or furnish, either directly or indirectly, except on prescription, any poisons enumerated in Schedules 'A' and 'B' . . . unless there is affixed a poison label to the package, box, bottle or paper, in which the poison is contained. The word 'poison' shall be distinctly shown on said label, together with the name of said place of business of the seller, all of which shall be printed in red ink. In addition the name of such poison shall be printed or written thereupon in clear print. (e) No person shall sell, distribute or furnish any poison named in Schedule 'A' or 'B' . . . unless on inquiry it is found that the person desiring it is aware of its poisonous character and it satisfactorily appears that the poison is to be used for a legitimate purpose. . . . (i) Any person violating any of the provisions of this section is guilty of a misdemeanor . . . ."

perior Ct. 100, 234 A. 2d 913 (1967). In writing for a six-judge majority, Judge MONTGOMERY held that appellant had not violated the Pharmacy Act and, therefore, was not guilty of a misdemeanor-manslaughter, but that the evidence justified the conclusion that appellant was guilty of involuntary manslaughter. Judge HOFFMAN dissented, maintaining that the Superior Court should not affirm the convictions on the grounds of involuntary manslaughter when the trial court had apparently rested its decision solely on the violation of the Pharmacy Act.

The first question we must answer is whether appellant violated the Pharmacy Act. The Act defines any product containing more than one per cent methanol as a poison and provides that any person selling such a product must properly label the container, warn the purchaser of the dangerous propensities of the product and satisfy himself that the purchaser will use the product for a legitimate purpose.

Certain facts are clear in this case. First, the Sterno sold by appellant is a poison as defined by the Act. Second, appellant did not comply with the requirements outlined above. Judge GUERIN held that this was enough to justify a conviction under the Act; the Superior Court unanimously disagreed.[2] Judge MONTGOMERY wrote, "Our close study of the 1961 Pharmacy Act leads us to the conclusion that it was not intended to cover general commercial products but was limited to drugs and devices as defined in the act and that the provisions respecting poison are to be followed only when poisonous drugs or poisonous devices are sold in connection with the practice of pharmacy or

[2] Although Judge HOFFMAN dissented to the majority's decision affirming the convictions, he agreed with the majority that appellant had not violated the Pharmacy Act.

incident thereto." (211 Pa. Superior Ct. at 106) We agree with this conclusion and will add only a few observations to supplement the excellent analysis contained in Judge MONTGOMERY'S opinion.

First, after viewing the Pharmacy Act as a whole, we conclude that the legislature intended only to regulate the practice of pharmacy. The title to the Act states: "An Act relating to the regulation of the practice of pharmacy, including the sales, use and distribution of drugs and devices at retail; and amending, revising, consolidating and repealing certain laws relating thereto." The Act contains seven sections in addition to the title, definitional and repealer sections; six of these sections deal exclusively with the practice of pharmacy. The only section which conceivably is not limited to the practice of pharmacy is the ninth section dealing with poisons. We cannot believe that the legislature intended to slip a general criminal statute controlling the sale and distribution of poisons in the middle of a statute regulating the practice of pharmacy.

Second, if the legislature did intend that Section 9 should be a general criminal statute regulating the sale and distribution of poisons, then we feel that a comment made by the Attorney General in an opinion holding that phosphorus matches are not a "poison" as defined by the 1887 version of the Pharmacy Act is relevant: "If this act were construed to apply to phosphorus contained in articles of merchandise not intended or used as drugs or medicines, it might then be said with great force that it would violate section 3 of art. III of the constitution of Pennsylvania, which provides: 'No bill, except general appropriation bills, shall be passed containing more than one subject, *which shall be clearly expressed in its title,*' because there is no notice in the title of the intention to regu-

late the sale of such articles of merchandise."[3] Phosphorus Matches, 21 Pa. Dist. 554, 556 (1912).

Third, subsection (b) of Section 9 gives the State Board of Pharmacy the power to add to or delete from the proscribed list of poisons contained in subsection (a). If §9 is interpreted as a general criminal statute, then this would mean, in effect, that the Pharmacy Board could create a new general criminal offense by adding a new substance to the proscribed list of poisons. We cannot believe that the legislature ever intended that the Pharmacy Board have such power.

Fourth, in holding that appellant had violated the Pharmacy Act, Judge GUERIN stated that he reached this result in part because of significant changes in the 1961 Pharmacy Act. We have studied all the relevant versions of the Pharmacy Act beginning with the Act of May 24, 1887, P. L. 189, and we find that the Act of 1961 does not differ in any material respects from these earlier acts. While it is true that for the first time, the Act of 1961 includes a definition of the word "person" in the definitional section, nevertheless, we do not interpret this to mean that the legislature intended to increase the scope of the Act's coverage. The relevant portions of the sections dealing with poisons in the various acts are virtually identical. The changes in the 1961 Act are insignificant; we cannot conclude that the legislature intended a major change in emphasis by these slight alterations which were made in the 1961 Act.

The second issue in this case is whether appellant is guilty of involuntary manslaughter in each or any of the four appeals presently before us. The Penal Code defines involuntary manslaughter as a death

---

[3] See also: *Commonwealth v. DePofi*, 362 Pa. 229, 243-47, 66 A. 2d 649 (1949); *Commonwealth v. Kebort*, 212 Pa. 289, 61 A. 895 (1905).

"happening in consequence of an unlawful act, or the doing of a lawful act in an unlawful way . . . ." (Act of June 24, 1939, P. L. 872, §703, 18 P.S. §4703) Since we have determined that appellant did not violate the Pharmacy Act in selling the new industrial Sterno, the second portion of this statutory definition must be controlling.[4] When a death results from the doing of an act lawful in itself but done in an unlawful manner, in order to sustain a conviction for manslaughter the Commonwealth must present evidence to prove that the defendant acted in a rash or reckless manner. *Commonwealth v. Ushka*, 130 Pa. Superior Ct. 600, 603, 198 A. 465 (1938); *Commonwealth v. Gill*, 120 Pa. Superior Ct. 22, 31, 182 A. 103 (1935). The conduct of the defendant resulting in the death must be such a departure from the behavior of an ordinary and prudent man as to evidence a disregard of human life or an indifference to the consequences. *Commonwealth v. Hartle*, 200 Pa. Superior Ct. 318, 324, 188 A. 2d 798 (1963). Furthermore, there must be a direct causal relationship between the defendant's act and the deceased's death. *Commonwealth v. Root*, 403 Pa. 571, 170 A. 2d 310 (1961); *Commonwealth v. Comber*, 374 Pa. 570, 581, 97 A. 2d 343 (1953).

We have searched in vain for cases from this Commonwealth involving factual situations similar to the one now before us. We have, however, found four cases from other jurisdictions which are on point. In the

---

[4] We express no opinion as to whether appellant violated the Pennsylvania Liquor Code in selling Sterno for drinking purposes. At least two courts have held that the manufacture of moonshine, which violates liquor control laws, is merely *malum prohibitum* and that if a death results from drinking the moonshine, the violation of the liquor code is insufficient to justify a conviction for misdemeanor manslaughter. *People v. Pavlic*, 227 Mich. 562, 566, 199 N.W. 373 (1924); *Thiede v. State*, 106 Neb. 48, 51, 52, 182 N.W. 570 (1921).

leading case, *Thiede v. State*, 106 Neb. 48, 182 N.W. 570 (1921), the defendant gave the deceased moonshine containing methanol, the drinking of which resulted in his death. While noting that the defendant had violated the state prohibition laws, the court refused to rest the manslaughter conviction on this statutory violation, holding that the manufacturing and distribution of moonshine was merely malum prohibitum and not malum per se. The court continued, "We cannot go so far as to say that [dispensing moonshine], prompted perhaps by the spirit of good-fellowship, though prohibited by law, could ever, by any resulting consequence, be converted into the crime of manslaughter; *but, where the liquor by reason of its extreme potency or poisonous ingredients,* is dangerous to use as an intoxicating beverage, where the drinking of it is capable of producing direct physical injury, other than as an ordinary intoxicant, and of perhaps endangering life itself, *the case is different, and the question of negligence enters; for, if the party furnishing the liquor knows, or was apprised of such facts that he should have known, of the danger, there then appears from his act a recklessness which is indifferent to results.* Such recklessness in the furnishing of intoxicating liquors, in violation of law, may constitute such an unlawful act as, if it results in causing death, will constitute manslaughter." (106 Neb. at 57, 58) (Emphasis added) See also, *People v. Pavlic*, 227 Mich. 562, 567, 199 N.W. 373 (1924); *State v. Keever*, 177 N.C. 114, 116, 97 S.E. 727 (1919), reversed on other grounds, *State v. Phillips*, 264 N.C. 508, 142 S.E. 2d 337, 342 (1965); *State v. Takano*, 94 Wash. 119, 122, 123, 162 Pac. 35 (1916).

We conclude, after studying the record, that appellant fits within the blackletter rule laid down in *Thiede* and that the Commonwealth has made out all

the elements necessary to warrant a conviction for involuntary manslaughter. First, the record establishes that appellant sold the Sterno with the knowledge that at least some of his customers would extract the alcohol for drinking purposes. Witnesses for the Commonwealth testified that when they purchased the Sterno from appellant, they would merely say "make one" or hold up fingers to indicate how many cans they wanted; one witness testified that appellant referred to the Sterno as shoe polish and on one occasion shouted to him on the street asking how he and his wife were making out with their shoe polish; finally, the witnesses testified that appellant asked them to conceal the Sterno under their coats when leaving his store. Such conduct does not square with the conclusion that appellant was merely selling the Sterno for cooking and heating purposes. Second, appellant was aware, or should have been aware, that the Sterno he was selling was toxic if consumed. The new industrial Sterno was clearly marked as being poisonous. Even the regular Sterno is marked "Caution. Flammable. For Use only as a Fuel" and if consumed internally may have serious consequences. Furthermore, when appellant was informed about the first deaths from methanol poisoning, he told the boy who worked in his shop to tell any police who came around that there was no Sterno in the store. Appellant also told the police that he had never purchased any Sterno from the Richter Paper Company. This evidence indicates to us that appellant was aware that he was selling the Sterno for an illicit purpose.

Appellant presses several contentions for our consideration. First, he claims that the Commonwealth has not established the necessary causal link between the sale of the Sterno and the deaths, citing *Commonwealth v. Root*, supra. We cannot agree. First, ap-

pellant sold the Sterno knowing, or having reason to know, that some of his customers would consume it. Second, some of his customers did consume the new industrial Sterno and died as a result. The Commonwealth's expert toxicologist testified that in several of the cases death could only have resulted from consumption of the new as opposed to the regular Sterno. Since appellant was the only retail outlet for the new Sterno in Philadelphia, these persons must have died from drinking Sterno purchased in appellant's store. Third, *Root* does not help the appellant. *Root* involved a drag racing situation. The decedent died when he negligently passed the defendant on a two-lane road and collided with a truck. This Court held that the defendant could not be held criminally responsible for the deceased's death because there was no direct causal connection between the defendant's act in engaging in a drag race and the deceased's death. The court in *Thiede,* in answering an argument similar to the one now made by appellant, stated: "Defendant contends that the drinking of liquor by deceased was his voluntary act and served as an intervening cause, breaking the causal connection between the giving of the liquor by defendant and the resulting death. The drinking of the liquor, in consequence of defendant's act, was, however, what the defendant contemplated. Deceased, it is true, may have been negligent in drinking, but, where the defendant was negligent, then the contributory negligence of the deceased will be no defense in a criminal action." (106 Neb. at 58, 59) See also: *State v. Takano,* 94 Wash. 119, 123, 162 Pac. 35 (1916).

Appellant next criticizes the following sentence in Judge MONTGOMERY'S opinion: "In the light of the *recognized weaknesses* of the purchasers of the product, and appellant's greater concern for profit than with the results of his actions, he was grossly negli-

gent and demonstrated a wanton and reckless disregard for the welfare of those *whom he might reasonably have expected* to use the product for drinking purposes." (211 Pa. Superior Ct. at 110) (Emphasis added) Appellant argues that the Superior Court is here imposing an inequitable burden on sellers of Sterno by requiring them to recognize the "weaknesses" of their customers. Appellant has exaggerated the import of this sentence. The Superior Court was not imposing a duty on all sellers of Sterno to determine how their customers will use the product. The Court was merely saying that if a seller of Sterno is aware that the purchaser is an alcoholic and will use Sterno as a source of alcohol, then the seller is grossly negligent and wantonly reckless in selling Sterno to him. We do not think this imposes an intolerable burden on sellers of Sterno.

Finally, appellant maintains that in at least one of the four convictions, the evidence indicated that the deceased purchased the Sterno from appellant's helper and that appellant had not sanctioned the sale. Appellant maintains that he cannot receive a prison sentence for such vicarious liability, citing *Commonwealth v. Koczwara*, 397 Pa. 575, 155 A. 2d 825 (1959), *cert. denied*, 363 U.S. 848 (1960). In that case, this Court struck down a three-month prison sentence meted out for a second violation of the liquor code where it appeared that the defendant's bartender had sold liquor to minors without the knowledge or consent of the defendant. *Koczwara* is presently inapposite. While appellant may not have been present when some of the Sterno was sold, there is ample evidence in the record that he was aware of and condoned such sales.

We have carefully reviewed the evidence in each of the four cases before us and are convinced that the Commonwealth has met its burden of proof in each

case. In three of the cases there is direct testimony that the deceased drank a beverage made from industrial Sterno purchased from the appellant and died as a result.[5] In the fourth case the evidence is more circumstantial. The deceased died of methanol poisoning which would be consistent with the consumption of only the new as opposed to the regular Sterno. An empty can of the industrial Sterno was found near his body. Appellant's employee identified the deceased as a regular customer of appellant but could not be certain if the deceased had purchased Sterno between December 21 and December 28. We feel, however, that there is sufficient circumstantial evidence to affirm this conviction also.

The final issue for consideration stems from Judge HOFFMAN'S dissenting opinion. Judge HOFFMAN maintained that the court below based the convictions solely on the violation of the Pharmacy Act. Since the Superior Court unanimously agreed that the Pharmacy Act is inapplicable, Judge HOFFMAN argued that it would be a violation of appellant's procedural and substantive rights to affirm the conviction on a theory which the trial court had not considered.

We have carefully reviewed Judge GUERIN'S opinion denying appellant's motion for a directed verdict

---

[5] In the case of Juanita Williams, Bill 1949, her common law husband testified that he purchased three unlabeled cans of Sterno from appellant's store on December 24 and took them home where his wife mixed the contents with water. That night they both drank the mixture. Mrs. Williams died the next day and Mr. Williams eventually became blind.

In the cases of John Streich, Bill 1940, and James Newsome, Bill 1942, a John Woods testified that he purchased Sterno around this time from appellant's store and drank the contents along with the two deceased. Woods became sick immediately and was taken to the hospital where his stomach was pumped—apparently saving his life. The next day Streich and Newsome were found dead.

and the adjudication he wrote as required by Rule 46 of the Superior Court Rules. Although we agree that at times he seems to have blurred the two theories upon which he based the convictions, we believe that he did consider the evidence and reached the conclusion that appellant was guilty of involuntary manslaughter.

In his opinion at the close of the trial, Judge GUERIN made the following remarks before even mentioning the Pharmacy Act: "Involuntary manslaughter is an unlawful killing of another without malice. Involuntary manslaughter results where there is no specific intention to take life, but from the doing of a lawful act in an unlawful manner or from the doing of an unlawful act. There is an abundance of evidence in this case which satisfies me beyond a reasonable doubt that the conduct of the defendant with respect to all Bills of Indictment now remaining before me for disposition caused the death of the individuals named in the respective indictments. He proceeded without due caution. He was engaged in a business of selling a poisonous substance. He knew or should have known of the poisonous nature of the substance because in the majority, indeed, if not in all of the cases the container of the poisonous substance contained upon the lid thereof a warning in the shape of lettering stating that the contents were poison and containing the indication of danger which is known to all of us from early childhood, the familiar skull and crossbones."

Judge GUERIN'S later adjudication is somewhat more ambiguous because he devotes most of the opinion to a discussion of the Pharmacy Act. We feel, however, that the following excerpt indicates that he felt appellant was guilty of involuntary manslaughter as well as misdemeanor manslaughter: "Defendant was charged in thirty-one Bills of Indictment with the offense of involuntary manslaughter. Involuntary man-

slaughter is defined as an unlawful killing of another without malice; it results where there is no specific intention to take life, but from the doing of a lawful act in an unlawful manner, or from the doing of an unlawful act . . . . It was clear that defendant proceeded without due caution; that he was engaged in a business of selling a poisonous substance; that he knew or should have known of the poisonous nature of the substance because in the majority, if indeed in not all of the cases, the container of the poisonous substance had written upon the lid thereof a warning in the shape of lettering stating that the contents were poison as well as that indication of danger which is known to all of us from early childhood, the familiar skull and crossbones."

In conclusion, then, we find that Judge GUERIN did, in fact, consider the issue of involuntary manslaughter and did find appellant guilty of involuntary manslaughter. We need not, therefore, consider, assuming Judge HOFFMAN were correct as to the state of the record, whether his legal conclusions which follow therefrom are also valid.

Orders affirmed.

––––––

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Although I join in the opinion of the Court, I believe it is necessary to emphasize the controlling considerations which support the Court's holding that this case is an appropriate one for criminal sanctions. There can be little question that the record before us not only supports the findings of the court below but leads to the almost unalterable conclusion that appellant knew (or should have known) of the toxic nature of the product he was selling and knew of the exact use to which the Sterno would be put. Appellant was dealing with a product which when taken internally

clearly was a dangerous instrumentality. By selling it to the persons to whom he sold it, knowing that they would use it in a way that was certain to cause serious harm to themselves, appellant exhibited the indifference to and reckless disregard for human life that is the classic element of the involuntary manslaughter offense. No causation problem is presented by the allegedly "intervening" acts of the victims, since those acts are exactly what appellant knew would take place when he sold the Sterno to these customers.

In my view, it is crucial that this record presents no question whether appellant investigated—or was obligated to investigate—the use to which his customers would put the product. It is clear that appellant knew that the skid-row alcoholics to whom he dispensed the Sterno would extract the alcohol for drinking purposes. As the majority correctly points out, our decision and the decisions below did not impose "a duty on all sellers of Sterno to determine how their customers will use the product. The Court was merely saying that if a seller of Sterno is aware that the purchaser is an alcoholic and will use Sterno as a source of alcohol, then the seller is grossly negligent and wantonly reckless in selling Sterno to him."