COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Frank and Kelsey
Argued at Salem, Virginia


JOSHUA PAUL COYLE

                                                            OPINION BY
v.        Record No. 0057-06-3        CHIEF JUDGE WALTER S. FELTON, JR.
                                                      NOVEMBER 27, 2007
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Glenn L. Berger (Berger & Thornhill, on brief), for appellant.

Donald E. Jeffrey, III, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Following a jury trial, Joshua Paul Coyle (appellant) was convicted of involuntary

manslaughter in violation of Code § 18.2-36.[1]  On appeal, appellant contends the evidence failed

to prove he acted in a criminally negligent manner when he provided DXM capsules he

packaged to Glenn Sherman Thomas.  He also contends the medical evidence was insufficient to

prove Thomas died of an overdose of DXM.  Finally, he asserts Thomas' voluntary ingestion of

the DXM capsules was the sole proximate cause of his death.  For the reasons that follow, we

affirm the judgment of the trial court.

_____

    [1]Appellant was also convicted of unlawful distribution of Xanax in violation of Code
§ 18.2-248; manufacturing or repackaging Dextromethorphan (DXM) without the supervision of
a pharmacist in violation of Code § 54.1-3438; distribution of adulterated DXM in violation of
Code § 54.1-3457; distribution of misbranded DXM in violation of Code § 54.1-3457, and two
charges of contributing to the delinquency of a minor in violation of Code § 18.2-371.  Those
convictions are not before us on appeal.

I.  BACKGROUND

"Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom."  Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  "'When a case, civil or criminal, is tried by a jury . . . the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'"  Charity v. Commonwealth, 49 Va. App. 581, 585, 643 S.E.2d 503, 505 (2007) (quoting Code § 8.01-680).  "[T]he relevant question is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Consistent with these principles, the evidence established that on January 23, 2005, at approximately 7:00 p.m., J.M. and Thomas, ages fourteen and seventeen, respectively, visited appellant at appellant's home.  Appellant and Thomas entered appellant's bedroom and locked the door.  When they emerged from the bedroom approximately thirty minutes later, J.M. saw appellant holding a bag containing white capsules wrapped together in groups of five.  Appellant, J.M., and Thomas smoked marijuana together that evening.  J.M. and Thomas left appellant's home sometime between 10:30 and 11:00 p.m.  On the walk to Thomas' home, Thomas showed J.M. five capsules of DXM,[2] as well as several capsules of Xanax, and told J.M. that appellant had given those drugs to him earlier that evening.

The next morning around 12:30 a.m., J.M. and Thomas each took one capsule of DXM. They talked until approximately 4:00 a.m. when J.M. fell asleep.  During the late morning hours

_____

[2] Dr. Kuhlman, an expert in forensic toxicology, explained that DXM is an antitussive ingredient contained in many over-the-counter cough medicines.  Its possession is not prohibited by Chapter 7, Article 1 of Title 18.2 of the Virginia Code.

of the same day J.M. awoke to the sound of Thomas snoring "very, very, very loud[ly]."  J.M. fell asleep again, and when he awoke approximately one hour later, Thomas "wouldn't wake up."  J.M. called the police.  Emergency personnel were unable to revive Thomas, who was transported to the hospital and pronounced dead around 3:30 p.m. that same day.

Detectives from the Danville Police Department searched Thomas' home pursuant to a search warrant in an effort to locate capsules containing DXM or Xanax, but found none.  Later the same day, detectives searched appellant's bedroom and located a "fanny pack" containing "capsules with an off-white powder inside," as well as empty capsules and "a manual device [for] making capsules, where you could take empty capsules and put [] [powder] in them and then close [the capsules]."  In his statement to police later that evening, appellant admitted, "I gave [] Thomas 3 or 4 DXM capsules and 3 Xanax pills. . . . Thomas took all the pills I gave him with him [when he left my home on January 23]."

Medical examiner Dr. Susan Venuti performed an autopsy on Thomas.  She concluded that Thomas' cause of death was an overdose of DXM, which depressed his respiratory system and caused him to stop breathing in his sleep.  The jury found appellant guilty of involuntary manslaughter.  The sole question on appeal is whether the evidence was sufficient to convict appellant of involuntary manslaughter of Thomas.

II.  ANALYSIS

A.  Appellant's Criminal Negligence in Providing Thomas with DXM

Appellant asserts the evidence was insufficient to support his conviction of involuntary manslaughter, arguing his conduct in providing Thomas with DXM, a legal substance, did not amount to criminal negligence.  We disagree.

Involuntary manslaughter may occur "during the prosecution of an unlawful, but not felonious, act, or during the improper performance of some lawful act."  Gooden v.

- 3 -

Commonwealth, 226 Va. 565, 571, 311 S.E.2d 780, 784 (1984). "The 'improper' performance of the lawful act, to constitute involuntary manslaughter, must amount to an unlawful commission of such lawful act, not merely a negligent performance. The negligence must be criminal negligence." Id. "To constitute criminal negligence essential to a conviction of involuntary manslaughter, an accused's conduct 'must be of such reckless, wanton or flagrant nature as to indicate a callous disregard for human life and of the probable consequences of the act.'" Davis v. Commonwealth, 230 Va. 201, 206, 335 S.E.2d 375, 378 (1985) (quoting Lewis v. Commonwealth, 211 Va. 684, 687, 179 S.E.2d 506, 509 (1971)).

It is well settled in Virginia that a conviction of involuntary manslaughter will be sustained where lawful acts performed in a criminally negligent manner cause the death of another. See e.g., Gallimore v. Commonwealth, 246 Va. 441, 436 S.E.2d 421 (1993) (death resulted from defendant's criminally negligent act of fabricating story likely to incite violence); Cable v. Commonwealth, 243 Va. 236, 415 S.E.2d 218 (1992) (defendant's criminally negligent shooting caused death of hunting partner); Kelly v. Commonwealth, 42 Va. App. 347, 592 S.E.2d 353 (2004) (father's criminally negligent failure to remove child from closed car for seven hours in hot weather resulted in child's death).

Virginia courts have not previously addressed whether providing dangerous quantities of a lawful substance to another who voluntarily ingests it and dies constitutes criminal negligence. However, other states have found criminal negligence to exist in similar circumstances. In Commonwealth v. Feinberg, 253 A.2d 636 (Pa. 1969), the Supreme Court of Pennsylvania found a storeowner acted in a criminally negligent manner when he sold sterno, used for heating and cooking purposes, to skid row customers when he knew, or should have known, they would extract and drink the toxic and potentially lethal methanol it contained. Id.

Here, evidence in the record established, and appellant does not contest, that he purchased pure DXM powder from an internet supplier for the purpose of experimenting with the various stages of the DXM "trip."[3]  In his written statement to the police, appellant explained that

> back in 2004, I wanted to experiment with DXM. . . .I found a place on the internet . . . that sells DXM in powder form.  My friends . . . and I went in on some DXM and purchased DXM over the internet.  I bought capsules from the internet and used digital scales to measure out exact measurements for each capsule.  I put [] 300 to 400 milligrams of DXM in each capsule.  Some [of the] capsules only weigh 100 milligrams.  You have to add different amounts to get to different stages with the trip caused by DXM.  They are called stages or plateaus.  It is 7 stages, and it takes more [DXM] to reach each stage.  The stages are 1. drunk/stone high 2. more excitable, like ecstasy 3. excitement plus colors, acid 4. energy goes away, zone out like anesthesia, you come down to level three 5. almost a coma state 6. deeper coma, passed out & forget [the] trip 7. *death*.

(Emphasis added).

Shortly after appellant purchased his first supply of DXM over the internet, he became aware of the dangerous nature of his packaging pure powdered DXM in large dosages.  He provided DXM in quantities sufficient to create the various stages of the DXM trip for L.M., a minor, who after taking one of the DXM capsules, became violently ill, and was rushed to the hospital to have her stomach pumped.  When a relative of L.M. asked appellant about the nature of the substance L.M. ingested, appellant admitted "you can hallucinate on it and . . . *it could kill you*."  (Emphasis added).

The record also establishes that despite his awareness that taking DXM in sufficient quantities to experience the DXM stages or plateaus could be lethal, appellant nevertheless

---

[3] "Trip" is defined as "an intense visionary experience undergone by a person who has taken a psychedelic drug" or "to get high on a psychedelic drug (as LSD)." Merriam-Webster's Collegiate Dictionary 1338 (11th ed. 2004).

continued to package DXM in large dosages. He purposely distributed those capsules to his friends so that they could experience the DXM "trip." On the night of January 23, 2005, appellant bundled five such capsules together and gave them to Thomas.

The record contains credible evidence from which a jury could reasonably conclude that appellant was criminally negligent when he acted in a "'reckless, wanton or flagrant nature as to indicate a callous disregard for human life,'" Davis, 230 Va. at 206, 335 S.E.2d at 378 (quoting Lewis, 211 Va. at 687, 179 S.E.2d at 509) "under circumstances reasonably calculated to produce injury, or which [made] it not improbable that injury would be occasioned, [where appellant knew,] or is charged with the knowledge of, the probable result of his acts," Bell v. Commonwealth, 170 Va. 597, 612, 195 S.E. 675, 681 (1938).

B. DXM as Cause of Thomas' of Death

Appellant also contends the medical evidence at trial failed to prove Thomas died of an overdose of DXM. He argues that, because the medical experts failed to quantify the precise amount of DXM necessary to cause death, the medical evidence failed to establish Thomas died of an overdose of DXM.

Contrary to appellant's assertions, the testimony of two experts provided credible evidence from which the jury could reasonably conclude that Thomas died from a DXM overdose. In a written statement to the police, appellant admitted that he gave Thomas several capsules, each containing 300-400 milligrams of DXM, hours before Thomas' death. Dr. Kuhlman, an expert in forensic toxicology, told the jury that Thomas' post-mortem toxicology reports revealed elevated levels of DXM in his bodily fluids and tissues. Dr. Venuti, an expert in anatomical and forensic pathology, testified that, in her professional opinion, "Thomas died from drug toxicity, due to Dextromethorphan." Further, police officers searched Thomas' home shortly after his death and no drugs were found. From this fact, a jury could

reasonably infer Thomas consumed all remaining capsules containing a minimum of 1200-1600 milligrams of DXM.

From this record, we cannot say that the jury's finding that appellant died from an overdose of DXM was plainly wrong or without evidence to support it. Code § 8.01-680. Accordingly, we will not disturb that finding on appeal.

## C. Thomas' Proximate Cause of Death

Finally, appellant contends that even if he were criminally negligent, and Thomas died of a DXM overdose, Thomas' own conduct in voluntarily ingesting the DXM capsules was the proximate cause of his death.

To sustain a conviction of involuntary manslaughter, the Commonwealth must prove that appellant's "criminally negligent acts were a proximate cause of [Thomas'] death." Gallimore, 246 Va. at 446, 436 S.E.2d at 424. In O'Connell v. Commonwealth, 48 Va. App. 719, 728, 634 S.E.2d 379, 383 (2006), we explained:

> "[t]here can be more than one proximate cause [of a harm] and liability attaches to each person whose negligent act results in the victim's injury or death. To be an intervening cause . . . [a harm] must have been an event which [the defendant] could not have foreseen. 'An intervening act which is reasonably foreseeable cannot be relied upon as breaking the chain of causal connection between an original act of negligence and a subsequent injury.' Delawder v. Commonwealth, 214 Va. 55, 58, 196 S.E.2d 913, 915 (1973). Furthermore, an intervening event, even if a cause of the harm, does not operate to exempt liability if the intervening event was put into operation by the defendant's negligent acts."

Id. (quoting Gallimore, 246 Va. at 447, 436 S.E.2d at 425) (other citations omitted).

In State v. Wassil, 658 A.2d 548, 556 (Ct. 1995), the Connecticut Supreme Court concluded, as we do here, that a victim's voluntary ingestion of a potentially lethal substance does not break the causal link between the provider's criminally negligent act in supplying the known dangerous substance and the victim's death. It explained:

"The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. . . . It is unnecessary for 'proximate cause' purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible." State v. Spates, [405 A.2d 656, 660 (Ct. 1978)]. The defendant's conduct need not be the predominating cause or the substantial factor in bringing about the victim's injuries, so long as his conduct was "a cause that necessarily set in operation the factors that accomplish the injury." State v. Leroy, [653 A.2d 161, 166 (Ct. 1995)].

Id. at 551-52. See also People v. Galle, 573 N.E.2d 569 (N.Y. App. Div. 1991) (one who knowingly supplies potentially lethal substances to victim is a proximate cause of victim's death as victim's self-administering substance was reasonably foreseeable).

Here, appellant intentionally and knowingly distributed five potentially lethal DXM capsules to Thomas, capsules appellant purposefully packaged for ingestion in large dosages. He knew that Thomas intended to ingest the DXM capsules to "trip." Thomas' ingestion of the DXM capsules was not only reasonably foreseeable, it was actually anticipated by appellant. Although Thomas' voluntary act of ingesting the adulterated DXM capsules was a contributing cause of his death, his voluntary act did not interrupt the natural and probable consequence of appellant's criminally negligent act of purposefully distributing DXM for ingestion in large dosages to Thomas so that he could experience the "DXM trip." The record before us clearly supports the jury's conclusion that appellant's criminally negligent conduct was a proximate cause of Thomas' death. Accordingly, we will not disturb the jury's verdict because it is not plainly wrong.

- 8 -

## III.  CONCLUSION

The record on appeal contains credible evidence to support the trial court's finding that the evidence was sufficient to convict appellant of involuntary manslaughter.  Accordingly, we affirm appellant's conviction.

<u>Affirmed.</u>