**UNITED STATES of America**
v.
**Carlton E. BRYANT**
**and**
**William R. Turner.**
**Crim. No. 1291–69.**

United States District Court, District of Columbia.

April 19, 1971.

**928**

Brian Shaughnessy, Asst. U. S. Atty., Washington, D. C., for government.

Nicholas Addams, David Applestein, Applestein & Applestein, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEONARD P. WALSH, District Judge.

This matter came before the Court pursuant to the order of remand of the United States Court of Appeals for the District of Columbia Circuit (App. No. 23,957), 439 F.2d 642, dated January 29, 1971, to conduct further proceedings, which were held on March 11, 29, 30 and April 5 and 6, 1971.

After careful consideration of all the testimony elicited at the remand hearing pertaining to (1) any suggestion of possible bad faith on the part of the government agents in their failure to preserve the tapes in question, (2) further inquiry into the regular procedures followed by the Bureau of Narcotics and Dangerous Drugs with respect to preservation of such tapes, (3) any efforts made at the time to preserve such tapes, and (4) further evidence as to the actions of all agents who might have had contact with the tapes, when viewed along with the importance of the evidence lost, and the uncontroverted evidence of guilt adduced at trial, leads this Court to conclude that the actions of the government agents did not demonstrate the bad faith which would warrant dismissal of the indictment.

It is this Court's conclusion that the ends of justice will best be served by affirmance of the indictment in this case. The following factors support this Court's decision:

### FINDINGS OF FACT

1. Agent Warden and Agent Wiser were present in a room on January 30, 1969, at the Holiday Inn at Fifteenth and Rhode Island Avenue, N.W. This room adjoined the room in which Agent

Pope, working undercover, was to make a narcotics transaction. [Remand Hearing Transcript, at 8, 105].[1]

2. The primary purpose of Agents Warden and Wiser's presence at this location was to survey the activities of Agent Pope [at 9].

Such a surveillance was necessary for the protection of Agent Pope as he was carrying a large sum of government funds with which he was to make a narcotics transaction [at 116]. Such was in planning for some four months and expected to be quite large. Further, it was made clear at the trial that the persons with whom Agent Pope was dealing were known to be "big" narcotic dealers [see this Court's Order of February 6, 1970] and known to carry weapons [at 15], and thus quite dangerous. There "has been a trend of increasing assaults against police officers and undercover officers even when their identity became known as an undercover officer, and an extra measure had to be taken to protect the officers." [at 115].

Further Agent Warden had discussed what measures could be taken to protect Agent Pope with Agent Walter Morris, who was in charge of the Washington Field Office of the Bureau of Narcotics and Dangerous Drugs at the time. He received specific instructions from Agent Morris that "surveillance for the safety of Agent Pope was paramount,". [at 121].

3. To accomplish this surveillance, a hole was bored in the wall between the two rooms [at 9], into which a plastic tube was placed with a small microphone at the end. [at 10]. This then was plugged into a tape recorder [at 10], along with a set of earphones, through which the actual surveillance was accomplished. The recorder was such that to hear conversations through the microphone, it had to be placed in the "record mode". [at 12]. The only reason for placing a tape in the machine was to prevent the reels from just spinning [at 13], which would give a noisy effect. [at 14].

4. Only one side of one tape was used during the entire surveillance, which began the evening of January 30 and continued through January 31, past midnight. [at 18].

5. At the conclusion of the operation, the tape was placed in the desk of Agent Warden, back at Bureau Headquarters. [at 19].

6. On two occasions, Monday, February 3, 1969, and a few days later, the tape was played in Agent Warden's office. [at 19]. There were a number of agents present on each occasion, including Agent Warden [at 69], Agent Morris [at 118] and Officer Busch [at 137]. Although Agent Warden did testify he would hear the conversation *through the monitoring devices* contemporaneously with the actual unfolding of the transaction in the adjoining room, he could not hear it when he replayed the tape. In fact on both of these occasions the tape was garbled and completely unintelligible [Trial Transcript at 32, 33, 38, 39; Remand Transcription at 20, 106, 118], and nothing of substance could be ascertained.[2] If a tape was intelligible, the practice in existence at the time would have been to transcribe it [at 146]. But such was not done in this case.

---

1. All transcript references hereafter are to the proceedings on remand held in March and April, 1971, unless otherwise indicated.

2. The Appellate Court found that the quality of the tape was "apparently" good [Opinion at 7]. However, a distinction needs to be made here between Agent Warden's hearing of conversation simultaneously to its actual occurrence and any subsequent hearing of conversation; the former being made possible by benefit of Agent Warden's earphones; the later being made impossible due to the unintelligibility of the tapes [Pre-trial at 24, 25, 26, 30, 31, 32; Remand at 12, 13, 14, 20, 21, 25, 93, 95, 264–A].

7. The tape was then returned to Agent Warden's desk, which remained unlocked. [at 90]. There was no thought to mention the existence of such tape until Assistant United States Attorney Rudy, in charge of the prosecution of defendants Bryant and Turner, inquired as to its possible existence [at 26, 175], after being informed of such by defense counsel Addams at a pretrial conference.

After the tape was found to be missing, Mr. Rudy requested that a diligent search of BNDD Headquarters be made [at 176]. Mr. Rudy continued to keep in touch with Agent Warden in order to keep apprised of any progress in this search. [at 177].

8. The tape was never found and since it was not in any way specially marked [at 21], it was probably considered among the stockpile of tapes available for use in subsequent surveillance intercepts. [at 27, 93].

9. The procedures in existence at the time for the recording and preservation of tapes [at 16], as well as Bureau Order 0–11,[3] were not followed by Agent Warden since he did not consider such a tape was a "recording" for evidentiary purposes and thus felt the above procedures were not applicable [at 25].

10. There was no deliberate destruction of the tape in question [at 28]. Agent Warden's actions in this case can be attributed to his discovery that the tapes were unintelligible. [Trial at 32, 33, 38, 39; Remand at 20, 106, 118]. Further, Agent Warden never denied the existence of such tape [at 28], and did undertake a diligent search for the tape when requested to do so.

Agent Warden did not appear to comply with Bureau procedures in existence at the time pertaining to electronic surveillance. However, such procedures, as

existed at the time, were not sufficiently clear as to what, if anything, was to be done with inaudible or unintelligible tapes.[4] [at 16].

11. Agent Pope did not at any time listen to this tape, and further had no independent knowledge of its existence.

Moreover, the evidence elicited from Agent Pope at trial was uninfluenced by the tape in question as such was not used in any way to refresh the Agent's recollection, nor used in preparation of his report. [Trial Transcript, at 115].

12. The testimony of Delores Snipes Miller was not at all relevent to this remand proceeding. Mrs. Miller was never present in the motel room at the same time as the defendant Bryant, although she did participate in some of the preliminary negotiations with "Bucklejaws" Johnson [at 228, 229]. Further, Mrs. Miller had no independent knowledge of whether a tape was even made. [at 227, 228].

Mrs. Miller gave conflicting answers as to why she did not testify at trial when asked by the government [at 229, 232] as well as by the Court. [at 230].

## CONCLUSIONS OF LAW

The tapes in question, if in existence, would be discoverable by appellants under either Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Jencks Act, 18 U.S.C. 3500, and F.R.Cr.P. 16. It is clear that "before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation." United States v. Bryant (United States v. Turner), 439 F.2d 642 (D.C.Cir., Jan. 29, 1971).

In this case the evidence was not preserved and thus it becomes necessary to examine the circumstances of the tape's

---

3. Defendant's Exhibit 1, in evidence at the remand hearing.

4. This Court finds that the BNDD has clarified its prior regulations by its regu-

lation of Feb. 19, 1971, which requires the preservation of all tapes, whether audible or inaudible. [also, see remand at 261, 262].

disappearance including (1) any suggestion of possible bad faith on the part of the government agents, (2) procedures followed by the BNDD with respect to preservation of such tapes, and (3) any efforts made at the time to preserve such tape. Such is necessary to determine whether full sanctions for nondisclosure ought to be invoked absolutely or whether imposition of sanctions ought to depend upon the circumstances of the material's disappearance. In United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the Supreme Court made clear that the circumstances of tape's disappearance is relevant to the question of proper sanctions. Thus it becomes necessary to determine whether the government has demonstrated the bad faith necessary to warrant dismissal of the indictment.

The tape, because it did not effectively preserve an intelligible conversation, never came into possession of the United States as a recording of the narcotics transaction, but was possessed only as an inaudible tape.

Agent Warden did not exhibit bad faith in his nonpreservation of the tape. He considered the tape of no apparent usefulness due to its being an unintelligible recording and thus exempt from the requirements of BNDD Order 0–11.

Although inaudible, the Government made diligent efforts to locate the tape once the request was made.

The tape recording, even if intelligible, would have had little effect on the case against defendants Bryant and Turner, as their defense was essentially that they did not participate in the transaction.

Thus, the Government's failure to produce an *inaudible* tape breached no duty of disclosure under either the Jencks Act, 18 U.S.C. 3500; F.R.Cr.P. 16; or Brady v. Maryland, *supra*, that would warrant the application of sanctions under any of the foregoing authorities in this case.