## Commonwealth *v.* Mace, Appellant.

464

Argued March 10, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Bruce E. Cooper*, with him *Charles E. Friedman*, and *Cooper, Friedman & Butler*, for appellant.

*Marion E. MacIntyre*, Second Assistant District Attorney, with her *Richard L. Guida*, Chief Deputy District Attorney, and *LeRoy S. Zimmerman*, District Attorney, for Commonwealth, appellee.

OPINION BY JACOBS, J., June 24, 1975:

The present case is before us due to the death of a woman from a bungled abortion attempt, committed before these operations were legally available. Appellant Wayne Mace was found guilty of involuntary manslaughter by a jury in connection with this death. He now appeals, alleging denial of due process because he was unable to examine independently certain autopsy specimens, and error of the lower court in failing to dismiss the charge of involuntary manslaughter when it was determined that the Commonwealth could not prevail on a misdemeanor manslaughter theory.[1] We find these contentions without merit and therefore affirm.

---

1. Appellant also argues the failure of the lower court to quash the indictment due to the unconstitutionality of the criminal statutes dealing with abortion under which he was originally indicted. [The Act of June 24, 1939, P.L. 872, §718, Abortion, and

466

The record reveals that the incidents surrounding the victim's death were as follows. In the early evening of August 15, 1971, when Mrs. Maley said goodnight to her husband and children, she was in excellent health. Later that night, she called her friend and employer, Mr. Anthony, from the Mace residence, requesting help. At Mr. Anthony's arrival, Mrs. Maley appeared pale and ill, and moments later collapsed, unconscious. Mr. Anthony promptly called his doctor, then put Wayne Mace on the line to explain Mrs. Maley's condition.[2] According to the doctor's testimony, the appellant informed the doctor that he had injected the victim with 30 or 40 cc's of potassium iodide to procure an abortion, and that she had apparently gone into shock. The victim was subsequently removed to a hospital where she died on August 18, 1971, without regaining consciousness.

Five different doctors and a toxicologist testified at trial as to the physical cause of death. Upon her admission to the hospital, the victim's condition was diagnosed as that of shock, a broad medical term which does not comprehend specific causes. *See Dorland's Illustrated*

---

§719, Abortion causing death, 18 P.S. §§4718, 4719 (printed at 18 Pa.C.S. App. at 324 and 330) was declared unconstitutional in *Commonwealth v. Page*, 451 Pa. 331, 303 A.2d 215 (1973)]. We know of no rule of law, however, which would prevent the Commonwealth from procuring an indictment for involuntary manslaughter simply because the original indictment was brought under a statute found unconstitutional in the interim. No principle of double jeopardy, or multiple prosecutions, can bar such a procedure since the defendant is not put in jeopardy until the actual trial is commenced. *See Commonwealth v. Smith*, 232 Pa. Superior Ct. 546, 334 A.2d 741 (1975); *Commonwealth v. Culpepper*, 221 Pa. Superior Ct. 472, 293 A.2d 122 (1972). In this case, proceedings had only advanced to the indictment stage and appellant was not yet placed in jeopardy. Consequently, the Commonwealth was not barred from seeking another indictment.

2. Appellant Wayne Mace lives with his father in the lodging and garage facility which the elder Mr. Mace runs. Wayne has studied embalming for a year.

*Medical Dictionary* 1374 (24th ed. 1965). At her death, the cause was recorded as shock status, cause unknown. An autopsy revealed the abdominal cavity full of two pints of loose blood. The hemorrhaging was due to the necrosis of tissue (death of tissue prior to death of the patient) in various reproductive organs. The body of the victim also evidenced severe damage to the lungs and brain. Portions of all these organs, as well as fluids from the body, were removed for further analysis. Tissue from the organs was preserved in paraffin to make it possible to cut microscopic slides.

Chemical analysis of the autopsy specimens revealed the presence of potassium iodide in various concentrations throughout the body. A medical expert stated that potassium iodide was a corrosive substance when it is in a concentrated state and gave the opinion that the chemical had been injected into the victim's system in such a strong concentration as to cause cardiac arrest and general collapse of the circulatory system, and to coagulate the protein molecules in the body tissue, thus creating massive hemorrhaging. In the doctor's opinion, the specific cause of Mrs. Maley's death from shock was the introduction of a strong concentration of potassium iodide into her system.

Appellant first argues that he was entitled to an independent medical expert's evaluation of the autopsy specimens to determine cause of death. It is undisputed that the actual tissue and other autopsy specimens removed during the autopsy were destroyed on January 14, 1972, by the laboratory where they had been analyzed.[3] Appellant's argument is based on the discovery rights available to a defendant under Pa.R.Crim.P. 310, which provides that discovery of evidence, other than written statements of the defendant, can be ordered upon timely

---

3. It appears that some of the paraffin imbedded tissue from which slides were cut was retained and made available for discovery.

application by a defendant when exceptional circumstances and compelling reasons have been shown to exist.[4] It is his position that because the prior destruction of the physical evidence made discovery under the rule impossible, he was denied his constitutional right of due process.

To support this contention, appellant cites *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971), *on remand, United States v. Bryant,* 331 F. Supp. 927 (D.D.C. 1971), *aff'd, United States v. Bryant,* 448 F.2d 1182 (D.C. Cir. 1971). That case concerns a tape recording of a conversation between the defendant suspected of dealing in narcotics, and the agent who was his primary accuser at trial. The defendant requested discovery of the tape but was informed that it was lost. The *Bryant* court held that, in order to give full effect to the Federal Rules of Criminal Procedure dealing with discovery,[5] "before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation." *United States v. Bryant,* supra at 651. When evidence is shown to be crucial to the defense, the prosecuting office has a burden of either producing it or explaining why it cannot do so. Thus the circumstances of the loss or destruction of evidence become relevant to determining whether sanctions for nondisclosure should be imposed on the prosecution. The court indicated that to satisfactorily carry its

---

4. Pa.R.Crim.P. 310 provides in part as follows: "All applications of a defendant for pretrial discovery and inspection shall be made not less than five days prior to the scheduled date of trial. The court may order the attorney for the Commonwealth to permit the defendant or his attorney, and such persons as are necessary to assist him, to inspect and copy or photograph any written confessions and written statements made by the defendant. No other discovery or inspection shall be ordered except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons."

5. The holding of this case is based on Fed.R.Crim.P. 16 and the Jencks Act, 18 U.S.C. §3500 (1969).

burden of explanation in the event of lost evidence, the prosecution must prove "earnest efforts" to preserve and, upon request, find evidence. The court recognized that earnest efforts could be proven where evidence was destroyed in good faith, according to routine practices which adequately protected the rights of the accused.

The *Bryant* court relied primarily on two Supreme Court opinions for its decision: *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Augenblick*, 393 U.S. 348 (1969). In *Brady*, where a statement of the appellant's co-defendant had been withheld by the prosecution despite the appellant's request, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, supra at 87. A new trial was granted. In *United States v. Augenblick*, supra, the tape of the interrogation of a witness was lost prior to the request for discovery. It was held, however, that the government met its burden in explaining its failure to produce the evidence. Testimony was heard from a number of witnesses concerning the interrogation, the manner in which such tapes were customarily handled, and the fate of the subject tapes. Furthermore, the Court stated that the issue involved a federal rule of evidence which was not of constitutional significance and was not to be extended to state criminal trials.[6]

The *Augenblick* and *Bryant* decisions specifically concern, as does the present case, the loss of discoverable evidence by the prosecution prior to the discovery request. Although they are not controlling on this Court, since

---

6. The decision involves the application of the Jencks Act, 18 U.S.C. §3500 (1969), as does the decision in *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971). *See* note 5, supra. The Jencks Act provides for the discovery of statements made by witnesses testifying against the defendant.

they do not define a policy of constitutional dimensions but merely interpret federal rules relating to discovery, the foundations of those opinions rest on the same policy that is expressed in *Brady v. Maryland,* supra, and has always been recognized by this Commonwealth. The Supreme Court stated its concern as follows: "Society wins not only when the guilty are convicted but when criminal trials are fair . . . . A prosecution that withholds evidence on demand of an accused . . . . helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile' . . . ." *Brady v. Maryland,* supra at 87-88. The Pennsylvania Supreme Court has discussed the function of the prosecutor in a like manner: "The interests of the Commonwealth do not require that a district attorney should win every case, but rather that justice should be done. The state has an interest in seeing that the innocent not be wrongfully punished, as well as in convicting the guilty." *Lewis v. Lebanon Court of Common Pleas,* 436 Pa. 296, 300-301, 260 A.2d 184, 187 (1969). *See also ABA Project on Standards for Criminal Justice,* Standards Relating to Discovery and Procedure Before Trial §2.4 (Approved Draft, 1970).

Pennsylvania's rule conferring the right of pretrial discovery on the defendant is narrowly restricted to inspection of statements made by the defendant. Other evidence must be shown to be the subject of "exceptional circumstances and compelling reasons" to be discoverable. *See* Pa.R.Crim.P. 310. Under the influence of *Brady v. Maryland,* supra, however, it would appear that discovery of all evidence under this rule is becoming progressively more available and the courts of this Commonwealth are evolving the concept that a duty is imposed on the prosecution not to make requested evidence valuable to the defense permanently unavailable. *See, e.g.,*

*Commonwealth v. Kontos,* 442 Pa. 343, 276 A.2d 830 (1971) ; *Lewis v. Lebanon Court of Common Pleas,* supra; *Commonwealth v. Robinson,* 229 Pa. Superior Ct. 131, 324 A.2d 441 (1974) ; *Commonwealth v. Walak,* 228 Pa. Superior Ct. 404, 323 A.2d 886 (1974).[7] Where the evidence requested no longer exists, however, no discovery rules have yet been adopted or sanctions imposed in this Commonwealth that would suggest a reversal is mandated. The federal procedure is particularly inapplicable in a case such as the one before us where the evidence is physical, and impermanent by its nature, unlike recorded statements of witnesses.[8]

The victim in the present case died on August 18, 1971, in the Ashland General Hospital. Regular hospital reports were kept and the doctors who attended the victim were available to testify. An autopsy was performed there by a resident pathologist who drew up an autopsy report indicating his findings. This doctor was available to testify. Parts of the victim's body were preserved and sent to laboratories for further analysis. Slides for microscopic study were made from some of the body tissue imbedded in paraffin. The doctors who analyzed the tissue were called to testify. Finally, after all the final reports had been concluded, the actual body tissue and some of

---

7. Other jurisdictions have adopted an approach similar to that in the federal courts when evidence has been destroyed by the prosecution. *See, e.g., People v. Hitch,* 12 Cal.3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974); *Birkla v. State,* —— Ind. ——, 323 N.E. 2d 645 (1975) ; *City of Seattle v. Fettig,* 10 Wash. App. 773, 519 P.2d 1002 (1974).

8. Where physical evidence is not available for trial, this Court has always held that "there exists no such rule as expounded by the defendant which would automatically necessitate his acquittal upon the Commonwealth's failure to produce physical evidence shown to be unavailable." *Commonwealth v. Cromartie,* 222 Pa. Superior Ct. 278, 280, 294 A.2d 762, 763 (1972). It has been suggested that the Commonwealth has a burden of establishing the unavailability of the evidence in such cases. *Commonwealth v. McGlory,* 226 Pa. Superior Ct. 493, 313 A.2d 326 (1973).

the paraffin imbedded tissue was routinely destroyed by a medical laboratory on January 14, 1972, five months after the victim's death. Ten days later, on January 24, 1972, a preliminary hearing was held. Counsel for the defense indicated that it was at the preliminary hearing that he first orally requested medical information and evidence. The actual written motion for pretrial discovery specifically requesting autopsy specimens was not filed until August 14, 1973.

At the hearing on the motion for discovery, the Commonwealth cooperated fully with the defense, agreeing to permit inspection of all the hospital records, the slides made from body tissue, all of the paraffin imbedded tissue that had been retained by the laboratory, in fact everything the Commonwealth's witnesses had except body fluids and the actual parts of the victim's body. Furthermore, the doctor who had chemically analyzed the blood and tissue taken from the body was made available to confer with the defense and its expert prior to trial. Of course, all the doctors were subject to cross-examination at trial.

When all these factors are taken into consideration, it is apparent that the Commonwealth has not overborne the defendant by secretly amassing evidence or designing a case unfairly weighted against him. The good faith of the Commonwealth is attested to by the willingness with which it agreed at the hearing to make available its evidence and witnesses relevant to the cause of death. The validity of the findings can be tested by the defense by examination of the slides, remaining imbedded tissues, and hospital records as well as by cross-examination at trial of the prosecution's six expert witnesses. *See Commonwealth v. Cromartie,* 222 Pa. Superior Ct. 278, 294 A.2d 762 (1972). Furthermore, the delay by the defense in requesting the evidence in writing, in a manner consistent with Pa.R.Crim.P. 310, left the lower court no choice but to proceed to trial without the lost evidence,

relying on the ample evidence which could still be discovered.

Appellant also contends that the charge of involuntary manslaughter should have been dismissed when the Commonwealth failed to prove its original theory of misdemeanor manslaughter. It is pointed out that the Commonwealth had originally brought two charges against the appellant: involuntary manslaughter[9] and practicing medicine without a license.[10] The Commonwealth initially sought to prove that the death occurred during the perpetration of the unlawful act of practicing medicine without a license. At the conclusion of the prosecution's case, however, the charge of practicing medicine was dismissed. Thus, it is appellant's feeling that the involuntary manslaughter charge should also be dismissed.

Involuntary manslaughter can be found where the conduct causing death is either unlawful in itself, or done in such a rash and criminally negligent manner as to be deemed reckless. This Court has frequently stated the degree of recklessness required: "Where, as here, the act causing death is not in itself unlawful, to make it criminal the negligence of the defendant must be such a departure from prudent conduct as to evidence a disregard of human life or an indifference to consequences." *Commonwealth v. Zeringo,* 214 Pa. Superior Ct. 300, 302, 257 A.2d 692, 693 (1969). *See also Commonwealth v. Feinberg,* 433 Pa. 558, 253 A.2d 636 (1969); *Commonwealth v. LaPorta,* 218 Pa. Superior Ct. 1, 272 A.2d 516 (1970). In the present case, much evidence was intro-

---

9. Act of June 24, 1939, P.L. 872, §703, 18 P.S. §4703 (1963) *repealed,* Act of December 6, 1972, P.L. 1482, No. 334, §5. This Section reads in part: "Whoever is convicted of involuntary manslaughter, happening in consequence of an unlawful act, or the doing of a lawful act in an unlawful way, is guilty of a misdemeanor...."

10. Act of June 3, 1911, P.L. 639, §2, *as amended,* 63 P.S. §401a (1968).

duced to show that the appellant's acts in administering such a strong dosage of potassium iodide to the victim was a rash and reckless act. One expert testified that, in his opinion, the concentration of the chemical when it was first injected was between seven and eight percent. In that concentration, potassium iodide is a corrosive substance which could cause cardiac arrest, collapse of the circulatory system, and coagulation of protein molecules in the body tissue causing hemorrhaging into the coagulated areas. Other medical experts stated that potassium iodide was never, in their experience, used to procure an abortion. Furthermore, there was sufficient evidence connecting Wayne Mace with the death, including his own admission to the doctor who was called when Mrs. Maley first collapsed, stating that he had administered the solution. On these facts, it was clearly within the jury's province to find that appellant, a layman, had recklessly administered a corrosive substance to a person, attempting to produce an abortion, which instead killed her.

Judgment of sentence affirmed.

WATKINS, P.J., HOFFMAN, CERCONE, PRICE, and VAN DER VOORT, JJ., join in this opinion.

———

CONCURRING OPINION BY SPAETH, J.:

I believe that when the prosecutor anticipates offering testimony based on physical evidence, he has a duty to preserve that evidence. Only by preserving the evidence can it be made available for pretrial discovery, if appropriate, *see* Pa. R. Crim. P. 310, and for production at trial. *See Commonwealth v. Kontos,* 442 Pa. 343, 276 A. 2d 830 (1971). As Judge SPAULDING stated in his concurring opinion in *Commonwealth v. Cromartie,* 222 Pa. Superior Ct. 278, 282, 294 A.2d 762, 764 (1972):[1]

———

1. HOFFMAN and CERCONE, JJ., joined in this concurring opinion.

"[A]llowing the state to bring in testimony based on physical evidence within its exclusive control while denying a defendant the opportunity to examine physical evidence amounts to a denial of due process when the opportunity to examine is crucial to defendant's ability to effectively impeach or contradict the state's witness, and when the physical evidence operates to establish an element of the crime or a direct link between the defendant and the crime alleged."

In the present case, the failure to preserve the autopsy specimens appears to have done appellant no harm. For that reason, I concur in affirming the judgment of sentence.

HOFFMAN, J., joins in this opinion.