405 A.2d 516

**COMMONWEALTH of Pennsylvania**

v.

**Christine P. DORSEY, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 8, 1977.

Decided May 25, 1979.

William A. Atlee, Jr., Lancaster, for appellant.

D. Richard Eckman, District Attorney, Lancaster, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

444

PER CURIAM:

The six judges who heard this appeal being equally divided, the judgment of sentence is affirmed.

PRICE, J., files an opinion in support of affirmance in which VAN der VOORT, J., joins.

SPAETH, J., files an opinion in support of reversal in which CERCONE, President Judge, joins.

JACOBS and WATKINS, former President Judges, and HOFFMAN, J., did not participate in the consideration or decision of this case.

PRICE, Judge, in support of affirmance:

Appellant was charged with delivery and conspiracy to deliver a controlled substance, specifically heroin, contrary to the Controlled Substance, Drug, Device and Cosmetic Act.[1] Following a three day jury trial, a verdict of guilty was returned on September 23, 1977. On April 15, 1977, appellant was sentenced on the delivery count to a term of imprisonment of 2½ to 10 years, and ordered to pay restitution to the Commonwealth in the amount of $2,000 plus costs of prosecution. An identical sentence, less restitution, was imposed on the conspiracy count, to run concurrently.

The record indicates that on the evening of March 25, 1976, an undercover agent of the Bureau of Drug Control of the Commonwealth of Pennsylvania went to a house located in the City of Lancaster for the purpose of purchasing narcotics. The home was the residence of a confidential informant, one Henry Rauser, and the informant's wife, who were both present that evening. Two police officers had the house under surveillance from an apartment across the street. At approximately 10:00 p. m., the two officers observed appellant drive up to the house and honk the horn. The informant left the house at that point and walked down the street out of sight of the officers. He returned about five minutes later and reentered his residence through the

1. Act of April 14, 1972, P.L. 233, No. 64, § 13(a)(30), *as amended*, 35 P.S. § 780–113(a)(30).

front door. Appellant then drove away but returned several minutes later. When appellant made this second stop, the police observed one Jeuelleo Vulto approach appellant's car on the driver's side, where appellant handed him a small dark package. Mr. Vulto took the package to the rear door of the house and was admitted by the informant. Several minutes later, appellant went to the front door and was admitted by the informant's wife.

The undercover agent in the house testified that he heard a car horn honk at about 10:00 p. m., at which time the informant left the house. He returned a few minutes later and immediately went to the back door and admitted Mr. Vulto. The two of them joined the agent in the living room, where the informant placed a small package on the table in front of the agent. While the agent was examining the package, there was a knock at the front door and the informant's wife left the living room to answer it. The agent testified that although he could not see appellant from where he was sitting, he heard appellant state that she wanted to hold the bag to make sure there was no switch. Appellant, carrying a package, and the informant's wife entered the living room together a moment later. The agent counted out the purchase price of $2,000 and placed the money on the table. At this time, Mr. Vulto got up, crossed the room to where appellant was sitting, and took the package from her. He approached the agent and said to him, "I'm selling this to you: do you understand? I am selling this to you." Mr. Vulto then handed the package to the agent. Appellant immediately said, "Give me the money." Mr. Vulto took the money off the table and handed it to her. She put the money in a small case which she in turn placed in her purse. Before departing, appellant approached the agent and asked to see his "tracks," the marks drug users have as a result of repeated injections. The agent replied that he didn't have any, and appellant retorted, "It don't matter. I didn't sell you nothing anyway." Appellant and Mr. Vulto then left together, and the agent left shortly thereafter.

At trial, the Commonwealth called the undercover agent and one of the policemen who had been observing from across the street, both of whom testified as related above. A state chemist was called who described the various tests he had performed on the substance in the package which led him to conclude that it was heroin. Mr. Vulto also testified for the Commonwealth that he went to see appellant for a shot of drugs, at which time she asked him to take a package to the A & M Bar and wait for Mr. Rauser (the informant). Appellant drove Mr. Vulto to the bar and gave him the package, which he took into the bar with him. He met Mr. Rauser there and followed him to Mr. Rauser's back yard, where Mr. Vulto gave him the package. Mr. Vulto then went to the front of the house and entered through the door. In the living room, he saw Mr. Rauser, appellant, and the undercover agent. Mr. Rauser gave the agent the package, and the agent gave Mr. Vulto $2,000. After placing the money in his pocket, he left with appellant and later gave the money to her. Mr. Vulto testified that he received three sacks of drugs for his efforts.

The defense presented two witnesses. The first of these, one Glenna Springer, stated that she had been in appellant's car with appellant and Mr. Vulto for a short ride immediately before appellant and Mr. Vulto went to the house of the informer. The witness testified that she did not see or hear anything relating to drugs while she was in the car.

The second witness for the defense was appellant herself. She testified that Mr. Vulto had approached her earlier that evening and offered her $5 to give him a ride to the A & M Bar and then take him home again. He told her that he was going to get $200 from Mr. Rauser for delivering something to him. Appellant acceded, dropped Mr. Vulto at the bar, and saw him enter. Shortly afterwards, she saw Mr. Vulto leave the bar and enter a house nearby. Appellant testified that she knew the house belonged to Mr. Rauser because she had dropped Mr. Vulto there several times. She waited a bit longer in the car and finally went up to the house, knocked, asked for Mr. Vulto, and was invited inside. Upon entering

the house she saw Mr. Vulto, the undercover agent, and Mr. and Mrs. Rauser. She asked Mr. Vulto why he was taking so long, and he responded that he was ready to go. They both left at that point.

Because none of the six contentions raised by appellant on this appeal is meritorious, we will affirm the judgment of sentence. Only two of these issues warrant extended discussion.[2]

Appellant first argues that the lower court erred in refusing to order the Commonwealth to reveal the names and whereabouts of the confidential informant and his wife. We were recently confronted with the same issue in *Commonwealth v. Bradshaw*, 238 Pa.Super. 22, 364 A.2d 702 (1975). Our discussion in *Bradshaw* is directly apposite to the instant situation.

"The leading cases, *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967), note that each case which presents the question of the informer's identity must be decided on an *ad hoc* basis. 'The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense.' 427 Pa. at 59, 233 A.2d at 287, *quoting* 353 U.S. at 62, 77 S.Ct. 623.

The facts and circumstances of the instant case are such that no useful purpose would be served by forcing disclosure of the informant's identity and whereabouts. The appellant does not dispute that he knew the informant by

**2.** The remaining four are:
"[1.] Where a witness for the Commonwealth testifies to a crime for which the defendant was not on trial, and which testimony was highly prejudicial to the defendant, must a new trial be granted?
[2.] Where it appears from the record that the learned trial judge conducted an examination of witnesses during the trial prejudicial to the defendant, is a new trial required?
[3.] Where the prosecuting officer gives testimony indicating the defendant's prior involvement in criminal activity not properly before the jury, is a new trial required?
[4.] Did the learned trial judge properly advise a co-conspirator of his constitutional privileges in the presence of the jury over the timely objection of the defense counsel?" [Brief for appellant at 2].

name, and had known him for some time prior to the commission of this crime. The record also discloses that appellant attempted to contact the informant at his parents' home, but could not locate him there. Under these circumstances, appellant was in possession of the information he now requests and was not prejudiced by a lack of disclosure. *Churder v. United States*, 387 F.2d 825, 831 (8th Cir. 1968) ('The government in its brief here and during oral argument stated that the defendant 'well knew the name of the informer in this case,' because it was the man (Leonard Aron) who was with him on the motel parking lot. . . . If Aron was one of the informants and this fact was known to the defendant, the issue disappears.')

Balancing the public interest in protecting the flow of information about drug sales with the need of this appellant for disclosure of the informant's identity, as is required by *Commonwealth v. Carter, supra,* we conclude that the scales tip in favor of the public interest. It has long been the policy of our courts to protect the informant's identity from disclosure unless a defendant is able to 'produc[e] evidence in support of his motion for disclosure.' *Commonwealth v. Pritchett*, 225 Pa.Super. 401, 407, 312 A.2d 434, 438 (1973). A mere allegation that the informant's testimony might be helpful is not sufficient to compel disclosure. *Commonwealth v. Pritchett, supra.* This appellant has not produced evidence that the informant was present when the sales occurred. Even accepting appellant's version of the events as true, he has not shown that the informant would be able to corroborate his defense of specific denial. By appellant's own testimony, the informant was not present at the second meeting with Officer Davis, and consequently could not corroborate the events which occurred at that time.

'Here the informant's participation was peripheral. He was not in a position to contradict or amplify any of the . . . testimony on which [appellant's] conviction rests.' *United States v. Brenneman*, 455 F.2d 809, 811 (3d

Cir. 1972). This appellant has not shown that the informant would be a 'valuable material witness for the defense.' *Zaroogian v. United States*, 367 F.2d 959, 962 (1st Cir. 1966).

A case by case erosion of the policy of protecting informants from disclosure is not sound where the moving party has not shown a compelling need for so doing. This appellant has shown no need, and we find no error in the action of the lower court." *Id.*, 238 Pa.Super. at 28–30, 364 A.2d at 705–06.

■ Distilling the tenets of *Bradshaw* and *Commonwealth v. Pritchett*, 225 Pa.Super. 401, 312 A.2d 434 (1973), the law in Pennsylvania concerning disclosure of police informers can be stated in the following way. The Commonwealth has a privilege to protect its confidential sources of information to insure the free flow of information concerning possible criminal activity. This privilege must be balanced against the right of the individual to a fair trial. In determining whether the facts in a particular case favor disclosure, the court should consider the crime charged, the possible defenses, the possible significance of the informer's testimony, and any other relevant factors. If, upon consideration of all the facts of the case, it appears that there is a *reasonable* possibility that the informant's testimony would exculpate the defendant, disclosure should be granted. The burden to establish such a reasonable possibility is on the defendant, and a bare allegation that the informer's testimony would be helpful is insufficient.

Instantly, we note that appellant does not present a defense of entrapment or mistaken identity. If these arguments were advanced, the testimony of the informant and his wife could easily be envisaged as potentially useful to appellant. Such is not the case, however. Rather, appellant simply argues that the informant and his wife *may* have given testimony that *may* have supported appellant's version of the facts and thus persuaded the jury, in some unspecified way, to reach a different result. This possibility has not a scintilla of support in the record, and the allegation is

patently insufficient in light of *Commonwealth v. Pritchett, supra.* Appellant admits her presence in the home. She admits she transported Mr. Vulto there. She admits her knowledge that he was delivering something for money.[3]

In view of this testimony and the nature of the defenses, it is clear that there was no reasonable possibility that any testimony by the Rausers could have exonerated appellant. Nevertheless, appellant posits three reasons why the Rausers' testimony might have accomplished this: (1) the testimony of the undercover agent and Mr. Vulto were inconsistent; (2) Mr. Vulto had provided a statement prior to trial which exculpated appellant; and (3) the conversation between Mrs. Rauser and appellant could have shed light on the latter's noncomplicity. On closer inspection, none of these is valid.

First, even though the versions of the transaction recounted by the agent and Mr. Vulto were somewhat inconsistent, both agreed on the crucial point that Mr. Vulto handed a pack of heroin to the agent in exchange for $2,000. Thus, because appellant does not argue that delivery failed to take place, or that the Rausers would so testify, their testimony on this point would be irrelevant.

Second, the pre-trial statement of Mr. Vulto asserting that there was no agreement between him and appellant to sell heroin was read into the record by defense counsel in an effort to impeach Mr. Vulto's credibility. The jury was thereby exposed to this theory of the transaction and chose to disbelieve it. If Mr. Rauser had testified to the same effect, it would have been merely superfluous.

Third, an examination of the record belies appellant's final contention. Appellant testified at trial that she had the following conversation with the person who opened the door, who must have been Mrs. Rauser:

3. Indeed, given appellant's association with Mr. Vulto, and the obvious fact that the latter knew the identity of the informant and his wife, it is probable that this information was available to appellant prior to trial. Nevertheless, we cannot agree with the court below that the record conclusively supports this presumption.

"A. When I got inside,—no, I asked for Jeuelleo and someone said, come in. I said no, just tell Jeuelleo I want him, I'm waiting on him. They said, come in and so I walked in." (N.T. 227).

Thus, appellant fully presented her version of the conversation at the front door, despite its hearsay character.

■ We may, therefore, conclude that any testimony offered by the Rausers would not have materially aided appellant. Balancing the competing interests of the Commonwealth and the individual, as mandated in *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967), we agree with the court below that the Commonwealth was not required to disclose the informant's identity.[4]

Finally, it is significant to note that in its closing charge to the jury, the court below gave the jury a "missing person" instruction with respect to Mr. Rauser; *i. e.*, if the jury found that it would have been natural and reasonable for the Commonwealth to have called Mr. Rauser, it could infer that his testimony could have been unfavorable to the Commonwealth. It thus appears that appellant was given every protection afforded by due process.

■ Appellant's final allegation of error meriting discussion concerns the propriety of the lower court's decision in denying appellant the right to test independently the substance claimed to be heroin. Initially, it is clear that this case is not controlled by the recently promulgated rule relating to pretrial discovery and inspection, Pa.R.Crim.P. 305, which is applicable only to indictments and informations filed on or after January 1, 1978. Rather, we must look to former Pa.R.Crim.P. 310, which was adopted on June 30, 1964, and became effective January 1, 1965. Former Rule 310 narrowly circumscribed a defendant's right to pre-trial discovery and provided in pertinent part:

4. Our conclusion that the identity of the informer and his wife was properly protected by the Commonwealth privilege obviates the necessity to decide whether disclosure of an informant's identity necessarily requires disclosure of his whereabouts.

"The court may order the attorney for the Commonwealth to permit the defendant or his attorney, and such persons as are necessary to assist him, to inspect and copy or photograph any written confessions and written statements made by the defendant. No other discovery or inspection shall be ordered *except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons.* The order shall specify the time, place and manner of making discovery or inspection and may prescribe such terms and conditions as are necessary and proper." (emphasis added).

After an extensive examination of the record, we can perceive no proof by appellant, nor any offer of proof, that exceptional circumstances or compelling reasons existed to justify her request for relief. Following suitable testing, it was the opinion of a qualified Commonwealth expert that the substance was heroin. The test and report included no exculpatory evidence.

Appellant urges, however, that the evolving trend toward more expansive discovery limits compels a different result. We do not agree. It is undeniably true that the new rules of criminal procedure greatly broaden the scope of discovery, but there is no requirement of retroactivity in either the law or the rule itself. Similarly, we do not believe that prior decisions of this court cited by appellant, *Commonwealth v. Mace*, 234 Pa.Super. 463, 341 A.2d 505 (1975), and *Commonwealth v. Cromartie*, 222 Pa.Super. 278, 294 A.2d 762 (1972), expanded the scope of former Pa.R.Crim.P. 310. Nor does the principle of due process demand any such expansion. If the supreme court intended to broaden the scope of discovery in that period, it could easily have made new Pa.R. Crim.P. 305 retroactive. It is not for this court summarily to alter that decision.

The judgment of sentence is therefore affirmed.

VAN der VOORT, J., joins in this opinion.

SPAETH, Judge, in support of reversal:

I should reverse and order a new trial because of the lower court's refusal to permit appellant to have an independent test made of the substance asserted by the Commonwealth to be heroin.

What the opinion in support of affirmance has said is: "If the Commonwealth says it's heroin, that's good enough for us." I see no sense in such a rule; indeed, I regard it as a denial of due process.

If the substance here had been destroyed—not deliberately but in good faith—it might make sense to say that appellant—and this court—must take the Commonwealth's word for it that the substance was heroin. We so held in *Commonwealth v. Mace*, 234 Pa.Super. 463, 341 A.2d 505 (1975). There, body tissue was routinely destroyed by a medical laboratory, some months after the victim's death. This destruction, however, resulted in no prejudice to the defendant, for

> the Commonwealth . . . agreed at the hearing to make available its evidence and witnesses relevant to the cause of death. The validity of the findings can be tested by the defense by examination of the slides [slides for microscopic study had been made from some of the body tissue], remaining imbedded tissues, and hospital records as well as by cross examination at trial of the prosecution's six expert witnesses.

234 Pa.Super. at 472, 341 A.2d at 510.

*Commonwealth v. Cromartie*, 222 Pa.Super. 278, 294 A.2d 762 (1972), is to the same affect. There, a crime laboratory destroyed the marihuana the defendant was charged with possessing. Again, however, this destruction resulted in no prejudice to the defendant, for the Commonwealth offered the laboratory report, which identified the substance as marihuana, and "[t]he defendant stipulated to the accuracy and admissibility of the laboratory report", 222 Pa.Super. at 279, 294 A.2d at 763.

Here, the contraband had not been destroyed. Therefore, inspection and testing by appellant's expert was feasible; nor does the Commonwealth assert otherwise. The opinion in support of affirmance says that even so, there should be no inspection and testing unless appellant proved "exceptional circumstances and compelling reasons." At 521.

However, the opinion in support of affirmance fails to define what it means by "exceptional" and "compelling". I find both of these requirements satisfied. To me, it is most "exceptional" when the Commonwealth asks a defendant to accept the word of one of its witnesses—which was the practical effect of what was done here; and the reasons for seeking an independent examination and test, as the only way to impeach that witness, are most "compelling" when the substance in question is the entire case—if the substance was not heroin, there is no case.

By far the most dramatic illustration of the point I wish to make is *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). There, the prosecution offered in evidence a pair of jockey shorts. A chemist from the State Bureau of Crime Identification testified that he had examined and tested the shorts, and had determined that they were stained with blood of human origin, group "A". Although this evidence was not, as here, the entire case, it was "an important link in the chain of circumstantial evidence against the [defendant]." 386 U.S. at 4, 87 S.Ct. at 786–7. The defense made an effort to have the shorts examined by defense expert but this request was denied by the court. Letter from defense counsel, quoted in Maguire, Weinstein, Chadbourn & Mansfield on Evidence 111 (6th ed. 1973). The defendant was convicted and sentenced to death, and the Illinois Supreme Court affirmed. Finally at a hearing in federal court on the defendant's petition for habeas corpus, the shorts were examined and it was proved that in fact they were stained with paint, and that the prosecution "had known at the time of the trial that the shorts were stained with paint." 386 U.S. at 6. The United States Supreme Court therefore set aside the conviction, holding that "the Fourteenth Amend-

ment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." 386 U.S. at 7.

I in no way intimate that here the substance was not heroin; I have no doubt that in fact it was heroin. That, however, is beside the point. The point is that the moment a court says, as the opinion in support of affirmance says, that despite a timely request, a defendant may be denied the right to test a substance alleged to be contraband, and never mind that there is no practical difficulty in permitting the test, at that moment the court makes possible the very sort of denial of due process that occurred in *Miller v. Pate.*

Furthermore, even if one puts aside the danger of such abuse, the opinion in support of affirmance's decision is unacceptable. A decision not only should in fact be fair; it must be seen to be fair. The opinion in support of affirmance, however, is one-sided: it favors the Commonwealth, without giving any reason for doing so. As appellant states in her brief:

Physical evidence is neutral. The provisions and restrictions concerning its examination and testing can readily be governed by court order. There is no threat or hazard to the Commonwealth which militates against providing the material for examination.

Appellant's Brief at 21–22.

The way to decide the rights of a defendant in a criminal case is to ask, "What rights should an *innocent* defendant have?" It is by answering this question that we define what "the presumption of innocence" means. "[A] defendant starts his life afresh, when he stands before a jury, a prisoner at the bar." *People v. Zackowitz,* 254 N.Y. 192, 197, 172 N.E. 466, 468 (1939) (CARDOZO, Ch. J.) If those who joined the opinion in support of affirmance had asked, "If *I* am accused of possession of heroin, ought I to be allowed, on timely request, to have my expert examine and test the substance the Commonwealth claims is heroin?", I've no doubt what their answer would have been.

The judgment of sentence should be vacated and the case remanded for new trial.

CERCONE, President Judge, joins in this opinion.